ROBERT E. WHEELER, APPELLANT, V. NEBRASKA STATE BAR ASSOCIATION, APPELLEE.

508 N.W.2d 917

Filed December 23, 1993.   No. S-92-268.

Robert E. Wheeler, pro se.

Paula J. Metcalf, Douglas J. Peterson, and James A. Snowden, of Knudsen, Berkheimer, Richardson & Endacott, for appellee.

HASTINGS, C.J., BOSLAUGH, CAPORALE, FAHRNBRUCH, and LANPHIER, JJ., and GRANT, J., Retired.

CAPORALE, J.

## I. STATEMENT OF CASE

After the district court sustained the defendant-appellee Nebraska State Bar Association's demurrer to the plaintiff-appellant Robert E. Wheeler's amended petition, Wheeler elected to stand on that pleading. The district court thereafter dismissed the suit. Although Wheeler assigns additional errors, they are subsumed in his claim that the district court erroneously determined that the amended petition failed to state a cause of action. The record failing to sustain that claim, we affirm the judgment of the district court without reaching the other assignments of error.

## II. FACTS

Wheeler, a former county court judge, alleges in his amended petition that the bar association, in releasing its "NSBA Judicial Performance Evaluation - 1990" of judges to the media, caused him to lose the 1990 election for retention in his judicial office and, in addition, has caused him to suffer general damage to his reputation which prevents him from gaining further employment. Wheeler further pleads that the bar association had reason to know that many of the lawyer survey responses were invalid, but nonetheless published the allegedly defamatory survey without investigating the truth or validity of the individual responses.

Averring that the bar association published the defamatory survey without regard to the truth or validity of the individual lawyer statements, Wheeler maintains that, in concert with its members, the bar association acted to defame him by including obviously invalid and vindictive responses in its survey.

More specifically, Wheeler asserts that prior to the release of the survey, the bar association published a news release in which, under the heading "Lawyers to rate judges' performance," the bar association stated its intention to publish an evaluation to give " ' ·"voters solid information about the judiciary to help them make informed decisions on judges standing for retention this November" ' " and to give

" ' "each judge a report card of his or her strengths and weaknesses." ' " The release went on to claim that " '[t]o assure valid results, lawyers must base their evaluations on recent, first-hand experience with the judge . . . .' " Wheeler professes that in making those statements, the bar association told the public that the survey's results were "fair, valid, and solidly based upon the facts of the judge's judicial performance."

The amended petition continues by reciting that on that same day, the bar association issued to its nonjudicial members a form on which they were to evaluate state and federal judges in 21 performance characteristics from a 1, very poor performance, to a 5, excellent performance.

The results, Wheeler asserts, were then received by the bar association and tabulated for distribution to the public without any statistical analysis to test the validity of the results obtained; nor did the bar association interpret the data collected or establish a mean or standard of deviation, despite the existence of a recognized science for evaluating the responses and drawing conclusions from the results. Wheeler also states that the bar association mailed the survey to all of its active members in disregard for the truth and validity of its results despite ethical restraints of the bar association that prohibit members from answering the survey if the member has not had sufficient experience with the judge's performance. Further, he alleges that more lawyers responded to his evaluation than there were lawyers with sufficient information to answer the survey and that, in fact, the number of lawyers who responded to his evaluation were more than the number who answered the survey of other judges with comparable judicial workloads and exposure.

Wheeler declares that the bar association made no investigation of the validity of the individual responses, nor did it establish any standards to assure the fairness and validity in its survey form and method. He concludes that the bar association released and published the judicial evaluation with actual malice and avers that the survey was used as the basis of further libel and defamation in a campaign against his retention, which use and abuse the bar association could reasonably have foreseen. Such actions, according to Wheeler,

constitute libel per se.

Reciting that after the survey was published, he lost the retention election by a margin of 173 votes out of a total of 8,861 votes cast, he seeks, among other things, money damages for the loss of his position as a judge and for the loss of his reputation. In addition to claiming that he was defamed, he asserts he was deprived of his federal and state rights to procedural and substantive due process and trial by jury and that the denial of these rights may entitle him to relief under 42 U.S.C. § 1983 (1988).

## III. ANALYSIS

### 1. SCOPE OF REVIEW

Before proceeding further, we once again recall that in considering a demurrer, a court must assume that the pleaded facts, as distinguished from legal conclusions, are true as alleged and must give the pleading the benefit of any reasonable inference from the facts alleged, but cannot assume the existence of facts not alleged, make factual findings to aid the pleading, or consider evidence which might be adduced at trial. *St. Paul Fire & Marine Ins. Co. v. Touche Ross & Co., ante* p. 408, 507 N.W.2d 275 (1993); *Gallion v. Woytassek, ante* p. 15, 504 N.W.2d 76 (1993); *Hamilton v. City of Omaha*, 243 Neb. 253, 498 N.W.2d 555 (1993); *LaPan v. Myers*, 241 Neb. 790, 491 N.W.2d 46 (1992).

A statement of facts sufficient to constitute a cause of action means a narrative of the events, acts, and things done or omitted which shows a legal liability of the defendant to the plaintiff. *St. Paul Fire & Marine Ins. Co., supra*; *Gallion, supra*; *Hamilton, supra*; *Gerken v. Hawkins Constr. Co.*, 243 Neb. 157, 498 N.W.2d 97 (1993).

In ruling on a demurrer, the petition is to be construed liberally; if as so construed the petition states a cause of action, the demurrer is to be overruled. *St. Paul Fire & Marine Ins. Co., supra*; *Matheson v. Stork*, 239 Neb. 547, 477 N.W.2d 156 (1991); *Widga v. Sandell*, 236 Neb. 798, 464 N.W.2d 155 (1991).

If from the facts stated in the petition it appears that the plaintiff is entitled to any relief, a general demurrer will not lie. *St. Paul Fire & Marine Ins. Co., supra*; *Central Nebraska*

*Public Power and Irrigation District v. Walston*, 140 Neb. 190, 299 N.W. 609 (1941).

## 2. NATURE OF DEFAMATION

The question of whether a particular publication is defamatory is, in the first instance, a question of law for the court. *Silence v. Journal Star Printing Co.*, 201 Neb. 159, 266 N.W.2d 533 (1978). Obviously, the nature of the allegedly defamatory statement is critical; beginning with dictum in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974), *appeal after remand* 680 F.2d 527 (7th Cir. 1982), *cert. denied* 459 U.S. 1226, 103 S. Ct. 1233, 75 L. Ed. 2d 467 (1983), courts began to distinguish between statements of fact and opinion, holding that statements of opinion were protected by the First Amendment and thus not actionable. See *Moyer v. Amador Val. Jnt. Union Sc. Dist.*, 225 Cal. App. 3d 720, 275 Cal. Rptr. 494 (1990).

> Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact.

*Gertz*, 418 U.S. at 339-40.

Sixteen years later, the U.S. Supreme Court rejected what it called "the creation of an artificial dichotomy between 'opinion' and 'fact.' " *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19, 110 S. Ct. 2695, 111 L. Ed. 2d 1 (1990), *on remand sub. nom Milkovich v. News-Herald*, 70 Ohio App. 3d 480, 591 N.E.2d 394, *cause dismissed* 59 Ohio St. 3d 702, 571 N.E.2d 137 (1991). The high court explained that the language in *Gertz* had been interpreted too broadly and was not intended to create a wholesale defamation exemption for anything that might be labeled opinion. Instead, the *Milkovich* Court made clear that a false assertion of fact could be libelous even though couched in terms of opinion, while still recognizing that statements that cannot be interpreted as stating actual facts are entitled to protection. Thus, the threshold question in defamation suits is whether a reasonable fact finder could conclude that the published statements imply a provably false factual assertion.

The *Milkovich* Court determined that the statement before it—that a high school wrestling coach lied at a judicial hearing—implied an assertion of fact. In reversing the dismissal of *Milkovich*, the Court cited three reasons a jury could conclude that the statement accused Milkovich of perjury: first, the statement was not loose, figurative, or hyperbolic language which would negate the impression that the writer was seriously maintaining Milkovich committed the crime of perjury; second, the general tenor of the article did not negate the impression created by the defamatory language; and third, the connotation that Milkovich committed perjury is sufficiently factual to be susceptible of being proved true or false.

Although *Milkovich* rested in part on the previous holding in *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 106 S. Ct. 1558, 89 L. Ed. 2d 783 (1986), *appeal dismissed, cert. denied* 475 U.S. 1134, 106 S. Ct. 1784, 90 L. Ed. 2d 330, which was explicitly limited to cases involving media defendants, courts have extended *Hepps* and *Milkovich* to nonmedia defendants. *Don King Productions, Inc. v. Douglas*, 742 F. Supp. 778 (S.D.N.Y. 1990); *Dodson v. Dicker*, 306 Ark. 108, 812 S.W.2d 97 (1991); *Kahn v. Bower*, 232 Cal. App. 3d 1599, 284 Cal. Rptr. 244 (1991).

The *Milkovich* test places emphasis on the objectivity and verifiability of a statement. In so doing, the approach is similar to pre-*Milkovich* cases using the fact-opinion analysis.

California courts use a " 'totality of the circumstances' " test to establish the objectivity and verifiability of a statement, examining first the language of the statement and then the context in which the statement was made. *Baker v. Los Angeles Herald Examiner*, 42 Cal. 3d 254, 260, 721 P.2d 87, 90, 228 Cal. Rptr. 206, 209 (1986), *cert. denied* 479 U.S. 1032, 107 S. Ct. 880, 93 L. Ed. 2d 834 (1987), *reh'g denied* 480 U.S. 912, 107 S. Ct. 1360, 94 L. Ed. 2d 531. See, also, *Milkovich, supra* (Brennan, J., dissenting).

In such an analysis, a court looks at the nature and full content of the communication and to the knowledge and understanding of the audience to whom the publication was directed. *Baker, supra*. A multifactor test assessing the allegedly defamatory statement in the totality of the circumstances in which it appears has been adopted in other states as well.

*Information Control v. Genesis One Computer Corp.*, 611 F.2d 781 (9th Cir. 1980); *Burns v. McGraw-Hill Broadcasting Co., Inc.*, 659 P.2d 1351 (Colo. 1983); *Cole v. Westinghouse Broadcasting Co., Inc.*, 386 Mass. 303, 435 N.E.2d 1021 (1982), *cert. denied* 459 U.S. 1037, 103 S. Ct. 449, 74 L. Ed. 2d 603. See, also, *Ollman v. Evans*, 750 F.2d 970 (D.C. Cir. 1984), *cert. denied* 471 U.S. 1127, 105 S. Ct. 2662, 86 L. Ed. 2d 278 (1985) (four factors used to assess whether statement viewed as fact: specificity of the statement, its verifiability, the literary context, and the broader setting in which the statement appears, e.g., part of a public debate); *Lester v. Powers*, 596 A.2d 65 (Me. 1991).

Indeed, *Letter Carriers v. Austin*, 418 U.S. 264, 94 S. Ct. 2770, 41 L. Ed. 2d 745 (1974), and *Greenbelt Pub. Assn. v. Bresler*, 398 U.S. 6, 90 S. Ct. 1537, 26 L. Ed. 2d 6 (1970), appear to have applied the analysis later delineated in *Milkovich*. In *Letter Carriers*, three nonunion employees of the postal service were included on a list of names titled "List of Scabs" circulated by the Letter Carriers Union. A piece of trade union literature defining a "scab" as a " 'traitor to his God, his country, his family and his class' " was attached to the list. (Emphasis omitted.) 418 U.S. at 268. In determining that the description of "scab" was opinion, the *Letter Carriers* Court considered both its specific linguistic context and its broader social setting. The Court found that "traitor," in the context of the union literature, was used in a loose, figurative sense and could not be taken for an assertion that the employees had committed the criminal offense of treason. The Court further noted that because the statements appeared in union literature, readers would be alerted by virtue of the broad context in which the statement was made that the statement was opinion.

*Letter Carriers* relied upon *Greenbelt Pub. Assn.* for the proposition that the allegedly libelous language must be evaluated in its broader context to assess whether a reader would have understood the allegation to be a statement of fact. In *Greenbelt Pub. Assn.*, a developer was attempting to secure a zoning variance to construct high-density housing. The developer's negotiating tactics were characterized as "blackmail" in the local paper, and he sued, alleging that the articles imputed a crime to him. The *Greenbelt Pub. Assn.*

Court reversed the developer's judgment against the newspaper which had printed this statement, concluding that as a matter of constitutional law, the word "blackmail" in these circumstances was not libel when reported. The *Greenbelt Pub. Assn.* Court then held that in light of the full context of the articles, a reader would have understood the blackmail statement as a criticism of the developer's negotiating tactics rather than as an actual criminal charge.

We hereby adopt the use of the totality of the circumstances analysis in determining whether a statement implies a provably false factual assertion. In applying that analysis to the case at hand, we must determine whether the allegedly defamatory statements of the bar survey had a precise meaning, likely to give rise to factual implications capable of proof or disproof. The complexity inherent in determining whether a statement is verifiable can be seen in the case of *Ollman, supra.* Therein, a professor stated that Ollman had no status within the political science profession. The *Ollman* court ruled that the quotation of the professor was protected as opinion and held that the no status charge would plainly appear to the average reader to be rhetorical hyperbole in light of Ollman's position as a professor at one university and his nomination as chairman of an academic department at another. One dissenter, however, reasoned that the statement was verifiable, such as by conducting a poll of American Political Science Association members as to their opinion, on a scale of 1 to 10, of the scholarly value of Ollman's work (Wald, J., dissenting in part). Contra, *Cepeda v. Cowles Magazines and Broadcasting, Inc.*, 328 F.2d 869, 870 (9th Cir. 1964), *cert. denied* 379 U.S. 844, 85 S. Ct. 51, 13 L. Ed. 2d 50 (remarks that a baseball player had " 'doghouse status' " not protected).

In the instant case, lawyers were asked to rate a judge with respect to knowledge and application of substantive law and rules of evidence and procedure; ability to perceive factual and legal issues; awareness of recent legal developments; an absence of bias or prejudice in civil and criminal cases; whether the judge was influenced by the nature of the case, identities of lawyers or litigants involved, or improper ex parte approaches; patience and courtesy to lawyers, litigants, witnesses, and

jurors; overall judicial temperament and demeanor; efficiency in docket management; punctuality in attending court proceedings and promptness in making rulings and giving decisions; attentiveness to arguments and testimony; management and control of trial; efficiency and conscientiousness as a worker; quality and clarity of written opinions; and an absence of undue personal observations or criticisms of litigants, judges, and lawyers from the bench or in written opinions. In addition, lawyers were asked to indicate whether the judge's health was such that the judge could effectively discharge the duties of the judicial office and whether the judge should be retained in office.

In a case very similar to the one at hand, *Aisenson v. American Broadcasting Co.*, 220 Cal. App. 3d 146, 269 Cal. Rptr. 379 (1990), a superior court judge brought a defamation suit against a television station as a result of the station's reporting that the judge had received the lowest score of all local superior court judges in an opinion poll of attorneys conducted by the station. The poll posed six questions similar to those in the poll now before us: Did the judge have the appropriate demeanor, temperament, courtesy? Was the judge usually decisive? Did the judge make efficient use of court time? Did the judge tend to impose appropriate sentences? Did the judge know the law? How did the judge rate overall? The attorneys ranked the judges on a 1-to-10 scale, with 10 as excellent, and, as in this case, were instructed to evaluate only those judges with whom they had enough experience to form a fair evaluation. The *Aisenson* court found that the poll reflected the opinions of the attorneys who participated in it, and those opinions are protected regardless of whether they are well founded or utterly wrong. However, the court reasoned that when the station broadcast the opinions of the attorneys, the opinions became facts and not editorial comment or criticism. Hence, the station would be liable only if it aired false statements of fact by not reporting the results of the poll truthfully and accurately. Finding that there was no evidence that the completed ballots had been tampered with, that the computer printout did not reflect the opinions expressed by the attorneys being polled, or that the data processing cards

inaccurately encoded the information contained in the ballots, the court ruled that the responses were not defamatory, noting that virtually every assessment of judicial performance short of a purely numerical comparison of verdicts or sentences must rely on the subjective opinions of observers. Therefore, to form the basis for a cause of action for defamation, the survey results must be verifiable.

Wheeler argues that some of the characteristics on which he was rated are subject to verification. He points out that the matter of docket control, punctuality, promptness in rendering opinions, and the quality of his opinions can be verified through local court records. In much the same manner, he asserts that his knowledge of the law can be discerned from his law school transcripts and his teaching abilities in new-judge orientations and seminars. Further, he argues that courtesy and judicial temperament are "not entirely subjective" and are determinable from tape recordings of each of the proceedings. Wheeler further urges that the matter of improper influences is verifiable, based on the number of appeals filed from his decisions.

Thus, contrary to the position taken by the *Aisenson* plaintiff, Wheeler complains that the bar association " 'did not interpret the data collected nor was it modified or altered in any manner,' " that " '[i]t was reported as received,' " and that "all survey returns [were included] in the published results." Assuming, without deciding, that the sources Wheeler points to could have some relevance in determining the characteristics on which he was judged, it is still clear that the survey was a compilation of attorneys' subjective ratings on each characteristic. As such, the ratings given him represented a collective subjective evaluation, which by its very nature ranged from well founded to utterly wrong. See *Botos v. Los Angeles County Bar Ass'n*, 151 Cal. App. 3d 1083, 199 Cal. Rptr. 236 (1984). Whether Wheeler receives a 1, 2, 3, 4, or 5 on a particular characteristic comes down to a subjective interpretation by an individual attorney. A representation that a candidate is able and has proper character and temperament is simply a subjective expression of opinion. *Association of Bar of City of New York v. C.I.R.*, 858 F.2d 876 (2d Cir. 1988), *cert.*

*denied* 490 U.S. 1030, 109 S. Ct. 1768, 104 L. Ed. 2d 204 (1989). Ratings by their very nature will reflect the philosophy of those doing the rating and are nothing more than expressions of subjective evaluations concerning a judicial candidate's qualifications. There is simply no objective method to determine the rating an individual judge should receive in any given performance category; therefore, by their very subjective nature, ratings cannot imply a provably false factual assertion.

Nor was the nature of the subjective evaluations changed by the fact that the bar association elected to characterize them as providing solid information giving each judge a report card of his or her strengths and weaknesses. Although the characterization is hyperbolic, given the context in which made, it is, as the foregoing review of the law demonstrates, a permitted exaggeration. The bar association's representation that to assure valid results lawyers must base their evaluation on recent, first-hand experience merely describes the manner in which the bar association intended the lawyers to perform.

It may be that Wheeler was in reality a good judge; but if so, he was nonetheless perceived by those who rated him to be otherwise. The raters had a right to their subjective views, and the bar association had the right to publish those collective impressions.

That being the situation, the judicial performance evaluation was, as a matter of law, not defamatory; Wheeler thus failed to state a defamation cause of action.

### 3. OTHER CAUSES

Wheeler's claim that he also stated other causes of action, as delineated in the last paragraph of part II of this opinion, is predicated on the existence of a cause of action for defamation. Since he failed to state such an action, it necessarily follows that he stated no other cause of action.

### IV. JUDGMENT

Accordingly, the judgment of the district court is affirmed.

AFFIRMED.

HASTINGS, C.J., not participating in the decision.

WHITE, J., not participating.