Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
09/16/2022 09:08 AM CDT

Choice Homes, LLC, appellant, v. Heidi Donner,
individually and as Personal Representative
of the Estate of Jeffrey B. Jackson,
deceased, appellee.

___ N.W.2d ___

Filed June 24, 2022.    No. S-21-572.

1. **Summary Judgment: Appeal and Error.** An appellate court affirms a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from the facts and that the moving party is entitled to judgment as a matter of law.

2. ____: ____. An appellate court reviews the district court's grant of summary judgment de novo, viewing the record in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor.

3. **Judgments: Appeal and Error.** An appellate court independently reviews questions of law decided by a lower court.

4. **Real Estate: Sales: Agents.** Pursuant to the Nebraska Real Estate License Act, any person collecting a fee or commission on the sale of real estate must be a licensed real estate broker or salesperson unless he or she meets one of the exceptions provided in the act.

5. **Statutes.** Statutory interpretation is a question of law.

6. ____. Statutory interpretation begins with the text, and the text is to be given its plain and ordinary meaning.

7. **Statutes: Appeal and Error.** An appellate court will not resort to interpretation of statutory language to ascertain the meaning of words which are plain, direct, and unambiguous.

8. **Summary Judgment: Appeal and Error.** In reviewing the district court's grant of summary judgment, an appellate court views the pleadings and admitted evidence de novo.

9. ____: ____. The grant of a motion for summary judgment may be affirmed on any ground available to the trial court, even if it is not the same reasoning the trial court relied upon.

10. **Contracts: Real Estate.** The Nebraska Real Estate License Act does not mandate that a person be compensated in a specific manner such as through a commission fee in a purchase agreement.

11. **Contracts: Real Estate: Vendor and Vendee.** If the owner of real estate enters into a contract of sale whereby the purchaser agrees to buy and the owner agrees to sell it and the vendor retains the legal title until the purchase money or some part of it is paid, the ownership of the real estate as such passes to and vests in the purchaser, and that from the date of the contract the vendor holds the legal title as security for a debt as trustee for the purchaser.

12. **Appeal and Error.** An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it.

13. **Libel and Slander: Negligence.** A defamation claim has four elements: (1) a false and defamatory statement concerning the claimant, (2) an unprivileged publication to a third party, (3) fault amounting to at least negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.

14. **Libel and Slander: Proof: Statutes.** By statute, truth in and of itself is made a complete defense unless the plaintiff proves the statements were made with actual malice.

15. **Libel and Slander.** The question of whether a particular publication is defamatory is, in the first instance, a question of law for the court.

16. **Libel and Slander: Proof.** The threshold question in a defamation suit is whether a reasonable fact finder could conclude that the published statements imply a provably false factual assertion.

17. **Constitutional Law: Libel and Slander.** Statements of fact can be defamatory whereas statements of opinion—the publication of which is protected by the First Amendment—cannot.

18. **Libel and Slander: Proof.** In determining whether a statement implies a provably false factual assertion, both the language of the statement and the context in which the statement was made must be examined.

19. **Constitutional Law: Libel and Slander.** To distinguish fact from opinion in a defamation claim, courts apply a totality of the circumstances test. Relevant factors include (1) whether the general tenor of the entire work negates the impression that the defendant asserted an objective fact, (2) whether the defendant used figurative or hyperbolic

language, and (3) whether the statement is susceptible of being proved true or false.

20. **Libel and Slander.** In addition to the content of the communication, a court looks to the knowledge, understanding, and reasonable expectations of the audience to whom the communication was directed, taking cues from the broader setting in which the statement appears.

21. **Actions: Libel and Slander.** Rhetorical hyperbole—language that, in context, was obviously understood as an exaggeration, rather than a statement of literal fact—is not actionable.

Appeal from the District Court for Douglas County: Shelly R. Stratman, Judge. Affirmed.

Christian R. Blunk, of Harris & Associates, P.C., L.L.O., and Douglas W. Ruge for appellant.

William N. Beerman and Patrick M. Flood, of Pansing, Hogan, Ernst & Bachman, L.L.P., for appellee.

Heavican, C.J., Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Cassel, J.

## I. INTRODUCTION

Choice Homes, LLC (Choice), appeals from an adverse summary judgment. Most of its claims stemmed from two failed purchase agreements—where it attempted to buy real estate (the property) from the owners and then sell it to the buyers. After the closing failed, the buyers purchased the property directly from the owners. Choice sued for money damages on the purchase-related claims and on a defamation claim for an online review posted by one of the buyers. The district court found that the Nebraska Real Estate License Act[1] (the Act) barred Choice's claims regarding the failed transaction and that the review contained only opinions and undisputedly true factual statements. Finding no reversible error, we affirm.

---

[1] See Neb. Rev. Stat. §§ 81-885.01 to 81-885.55 (Reissue 2014 & Cum. Supp. 2020).

## II. BACKGROUND

Before detailing the events underlying this appeal, we provide context by describing the property and identifying the persons involved.

### 1. Context

#### (a) Property

The property features a residential home that sits on a slope and abuts a river. Historically, the property suffered from erosion issues. Periodically, the property's slope would "collapse." Occasionally, since 1993, an engineering company conducted soil sample studies to monitor the property's erosion.

Around 2008, the slope behind the residential home suffered a significant collapse that required repairs. The engineering company conducted another soil sample study on the slope and proposed a plan to "rehab" the slope in 2009.

Following the study, the property's slope was regraded. However, the engineering company did not conduct another soil sample study after the slope was repaired.

#### (b) Persons

##### (i) Choice

Choice is a construction contractor that buys real estate and constructs residential homes. Often, Choice works with clients to purchase real estate and build a "custom" residential home on it.

Choice was owned by two individuals—Jason Gillman and Chad Bumsted. Choice claimed that Gillman and Bumsted were its only employees, because it delegated all its construction work and "office work" to subcontractors. None of Choice's employees were licensed real estate brokers, licensed associate brokers, or licensed salespersons. (For convenience, we refer to licensed real estate brokers, licensed associate brokers, and licensed salespersons collectively as "licensees.")

During the relevant events, Gillman served as Choice's primary representative. The vast majority of Choice's conduct

occurred through Gillman, acting on its behalf. For instance, Gillman negotiated with the owners and buyers, signed legal documents, and made representations on behalf of Choice. Bumsted played only a minor role, by corresponding with third parties through email.

### (ii) Owners

Alan and Carol Parsow (collectively the owners) owned the property. They were not named as parties in Choice's complaint, but their conduct is pertinent to the instant appeal. The record does not show whether the owners were deposed or otherwise involved in any discovery proceedings.

### (iii) Buyers

Heidi Donner and Jeffrey B. Jackson (collectively the buyers) sought to purchase the property. At the time of the events preceding Choice's lawsuit, Jackson was Donner's husband. The buyers had previous interactions with Gillman. They were Gillman's neighbors; he socialized with them, sharing drinks together and parking his motor home in their "tailgate" location during Nebraska football games. Jackson passed away in January 2019—less than a month after the buyers purchased the property from the owners, but before Choice filed its complaint.

### 2. TIMELINE OF EVENTS

Because the district court decided the case by summary judgment, we summarize the events in the light most favorable to Choice.

### (a) Negotiations

In 2018, Choice discovered the owners were considering selling the property and commenced negotiations with them. Choice entered into an oral agreement with the owners—where if "[Choice] found a buyer interested in [the property, the owners] would execute a purchase agreement and sell [it] to [Choice] for [a set price]."

Soon after, Gillman approached the buyers, proposing that they purchase the property from Choice. Gillman showed the property to the buyers multiple times.

On September 6, 2018, Jackson and Gillman communicated via text message regarding the condition of the property. (Throughout this opinion, we quote Jackson's and Gillman's text messages without correcting grammatical errors.) Jackson asked, "Are you aware that. [The property] had erosion problems in the past[?]" Gillman responded, "Yea it was over 10 years ago my wife's [family's grading company] did all the grading and it is more solid than any lot up there. Also [the engineering company] confirmed everything it's all good." Gillman's text seemed to be referencing the soil sample study conducted after the property's slope collapsed, but before it was regraded.

One day after Jackson and Gillman's conversation via text messages, the buyers agreed to purchase the property from Choice. Choice executed two separate purchase agreements on the same day—one with the owners and one with buyers. In one agreement, Choice agreed to purchase the property from the owners for $750,000; in the other, it agreed to sell the property to the buyers for $1.3 million. The terms of both purchase agreements set the closing date of October 31, 2018, through an escrowed transaction. The purchase agreement also required the buyers to provide Choice an additional $70,000 for "lost building fees," because the buyers chose a different contractor to build a new home on the property. Ultimately, Choice expected to profit by $620,000 from the transaction.

(b) Before Closing

Following the parties' signing their respective purchase agreements, each party began to complete their contractual duties to close on the property.

Choice and the owners completed most of their contractual obligations under their purchase agreement. The owners completed a seller disclosure statement, as required by Neb. Rev. Stat. § 76-2,120 (Reissue 2018), which disclosed the previous

erosion issues. Choice also obtained a loan to purchase the property from the owners.

However, the events differed between Choice and the buyers. Choice failed to complete its contractual obligations, and the buyers ultimately chose not to purchase the property.

Choice never provided a current title insurance commitment or a complete abstract of title to the buyers, as required under the purchase agreement. Choice directed a third party to prepare and deliver these documents to the buyers. However, the buyers denied receiving them.

Additionally, Choice never completed its own seller's disclosure statement. Choice provided the owners' seller disclosure statement to the buyers.

### (c) Failure to Close

On October 5, 2018, Jackson texted Gillman and indicated that the buyers would not close on the property, claiming Choice did not disclose the erosion issues. Jackson stated, "I will not execute the contract as the erosion was not advised up front and I am very concerned[.]" Donner testified that Jackson was upset that Gillman did not disclose any information or reports on the property's erosion history. Donner stated, "Most our information came from Carol Parsow about the erosion."

Gillman responded to Jackson's refusal to close by reaffirming his representation that the property no longer suffered from erosion issues. Gillman stated, "What I will call you this morning The ground is more secure than any ground up there. [The grading company] and [engineering company] did all the work like discussed[.]" However, Choice never sought to force the buyers to close on the property, because "there wasn't a whole lot of communication after that point."

Gillman claimed in his deposition that Alan Parsow communicated with him after the buyers told Choice that they would not purchase the property. Gillman testified that Alan Parsow stated:

> [The owners were not] going to pursue [their purchase agreement] with [Choice] and make [it] close on [the

purchase agreement] because if [the owners] would have, [it] would have had to close because [it] had a [purchase agreement] to close with [the owners], and he basically said [the owners were not] going to pursue [the purchase agreement].

After Choice's conversations with the owners, it never sought to enforce its purchase agreement with them, because "that was about it after that."

Choice did not close on the property pursuant to either purchase agreement.

### (d) Aftermath

In November 2018, the owners communicated with the buyers directly and inquired whether they would be interested in purchasing the property. Gillman attempted to interject Choice into the owners and buyers' discussions to "try[] to keep the agreements between [it, the owners, and the buyers] alive." However, the owners and buyers chose not to involve Choice in the discussions.

The owners sold the property to the buyers for $825,000 on December 24, 2018. Choice was not involved in the sale. Jackson passed away on January 12, 2019.

Months later, Donner posted a negative "Google Review" of Gillman and "Choice Custom Homes" (the review). For convenience, we quote the review in full in the analysis section.

### 3. District Court

Choice sued Donner, both as an individual and in her capacity as the personal representative of Jackson's estate (hereafter collectively Donner). It did not include the owners as parties in the action. We first summarize the pleadings and then turn to the arguments asserted on summary judgment.

### (a) Complaint and Answer

Choice alleged that Donner committed fraud, tortiously interfered with its business expectation, breached their purchase agreement, breached their implied covenant to act in

good faith, and were unjustly enriched. Choice also alleged that it had been defamed by the review.

In Donner's answer, she denied Choice's claims. She asserted an affirmative defense that she was not liable for defamation, because her statements were true. Donner also asserted counterclaims against Choice for fraud and unjust enrichment. Donner did not join the owners as third-party defendants.

For convenience, we divide Choice's claims into two overarching categories: (1) nondefamation and (2) defamation. The first category includes all of Choice's claims other than its defamation claim. The latter includes only the claim for defamation.

### (i) Nondefamation Claims

The crux of Choice's nondefamation claims were that it suffered monetary damages from the buyers' purchasing the property directly from the owners instead of through it. In Gillman's deposition, he characterized Choice's damages as "getting due what's fairly due to [Choice] for finding the property and introducing the two parties together and finding [the buyers'] dream property for them and [the owners] to get out of [the property]." When asked "what prohibited [the buyers] from reaching a separate deal with [the owners]" after Choice failed to close on the property, Gillman responded, "Ethical. Being ethical. Making sure that you're fair to all parties involved. . . . [T]hey didn't even know about each other. They didn't know about the property. . . . [T]he ethical part of this as far as like just taking somebody out of an agreement . . . ." Gillman asserted that the buyers could never buy the property from the owners at any time, because "[Choice] had the agreement with them, so the ethical and right thing to do is to honor their agreement if they're going to buy [the property]."

### (ii) Defamation Claim

Even though the review described actions of Gillman, Choice asserted that the statements damaged its reputation

and resulted in a decline in its business opportunities, because Gillman interacted with the public on its behalf.

### (b) Summary Judgment

Donner filed a "Motion for Partial Summary Judgment." The motion addressed only Choice's claims against Donner; it did not address Donner's counterclaims against Choice.

#### (i) Donner's Arguments

In support of Donner's motion, she asserted that Choice's claims were barred or unable to be proved through the evidence in the record. Donner characterized Choice's role in the failed transaction as that of a real estate broker facilitating the sale of the property from the owners to them. Donner argued the Act barred Choice—a nonlicensee—from recovering compensation for facilitating the sale of the property. Donner also argued that her statements in the review did not constitute defamation, because they were opinions.

#### (ii) Choice's Arguments

Choice opposed Donner's motion for summary judgment. Choice argued that the Act did not bar its nondefamation claims, because "'the present case does not involved [sic] compensation paid by [the owners] through a listing for the location of a buyer.'" Choice also contended that this was not "'a situation where someone is acting as a broker where a commission would be paid for acting as a broker in negotiating a transaction between a buyer and seller.'" Alternatively, Choice argued that its conduct fell under § 81-885.04(1)—an exception to the Act—and therefore, its nondefamation claims were not barred.[2]

### (c) Ruling

The court "granted in full" Donner's motion for summary judgment and dismissed Choice's complaint. The court found that the Act barred Choice's nondefamation claims and

---

[2] See § 81-885.04(1).

that Choice was not defamed by the review. The court did not address or dispose of Donner's counterclaims in this order. We summarize its reasoning regarding the respective categories.

### (i) Nondefamation Claims

#### a. Barred by the Act

The court ruled that the Act barred Choice's nondefamation claims, because, without being a licensee, it sought to recover compensation for performing services governed by the Act. The court looked beyond the "labels used by the parties, and instead focus[ed] on the substance of the parties' actions." The court found that Choice "'for any form of compensation or consideration' and 'with the intent or expectation of receiving the same from another,' 'negotiated . . . [the] sale, purchase[,] or option for any real estate or improvements thereon' and 'assist[ed] in procuring prospects' within the meaning of [§ 81.885.01([2])]."[3]

To support its findings, the court noted that Gillman testified in his deposition that he believed Choice suffered damages from not being compensated for brokering the sale of the property from the owners to the buyers. The court also cited Choice's decision to not close on its purchase of the property after the buyers stated they would not close on their purchase of the property from it. Finally, the court highlighted that Choice did not complete its own seller's disclosure statement: "Instead, like a broker, [Choice] passed along a [seller's disclosure statement] completed by the owners . . . ."

#### b. Not Excepted by § 81-885.04(1)

The court was unpersuaded by Choice's argument that its conduct fell under § 81-885.04(1). The court found that it was immaterial whether Choice obtained any ownership rights under the purchase agreement, because most of its conduct requiring a license occurred before it signed the agreement

---

[3] See § 81-885.01(2) (quoted by district court).

with the owners. Further, the court noted that Choice negotiated the sale of the "full legal title" in the property—not just equitable title—and therefore, it "broker[ed] a larger interest than [it] ever arguably held."

The court declined to consider Choice's oral agreement with the owners. The court explained that Choice introduced this agreement for the first time in Gillman's affidavit in opposition to Donner's motion for summary judgment (Gillman's affidavit). The court noted, however, that Gillman never discussed this agreement in his deposition. The court found that Gillman's affidavit "proffered evidence alleging facts materially different concerning a vital issue, with the change being made to meet the exigencies of pending litigation." Therefore, the court "discredited" Gillman's affidavit, relying upon *Momsen v. Nebraska Methodist Hospital.*[4]

## c. Alternative Findings

Even though the court found that the Act barred Choice's nondefamation claims, the court provided "[a]lternative [f]indings" to individually justify the dismissal of each nondefamation claim. But because we will not reach those findings, we need not summarize them.

### (ii) Defamation Claim

Regarding Choice's defamation claim, the court found that Choice could not prove it was defamed by the review, because Donner's statements were not false statements of fact. First, the court noted that Donner alleged in her pleadings that her statements were true and that Choice did not present evidence that she published her statements with actual malice.[5] Therefore, the court stated, the statements of fact that were undisputedly true did not defame Choice.

---

[4] *Momsen v. Nebraska Methodist Hospital*, 210 Neb. 45, 313 N.W.2d 208 (1981).

[5] See, Neb. Rev. Stat. § 25-840 (Reissue 2016); *White v. Ardan, Inc.*, 230 Neb. 11, 430 N.W.2d 27 (1988).

Further, the court explained, the statements that could not be proved to be undisputedly true did not constitute defamation, because they were her opinions. Those statements, the court said, "[G]o to impressions of credibility, honesty, and trustworthiness — adjectives which are subjectively formed in an individual's mind and are open to personal differences of opinion."

### 4. Appeal

Following the dismissal of Choice's complaint, Donner moved to voluntarily dismiss her counterclaims. The court sustained the motion. That order disposed of all remaining claims. We take this opportunity to remind trial courts that a recent statutory change requires a court rendering a judgment to sign "a single written document stating all of the relief granted or denied in an action."[6] Thus, where a judgment results from a series of documents, as here, the last one should include all relief granted or denied in the action, including relief previously set forth in interlocutory orders.

Choice filed a timely appeal. We moved the appeal to our docket.[7]

## III. ASSIGNMENTS OF ERROR

Choice assigns, combined and restated, that the court erred in finding that (1) the Act barred its nondefamation claims; (2) it could not prove the elements of its nondefamation claims for (a) breach of contract, (b) breach of the implied covenant to act in good faith, and (c) tortious interference with a business relationship or expectancy; and (3) it could not prove the elements of its defamation claim.

## IV. STANDARD OF REVIEW

[1,2] An appellate court affirms a lower court's grant of summary judgment if the pleadings and admitted evidence

---

[6] Neb. Rev. Stat. § 25-1301(2) (Cum. Supp. 2020).

[7] See Neb. Rev. Stat. § 24-1106(3) (Cum. Supp. 2020).

show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from the facts and that the moving party is entitled to judgment as a matter of law.[8] An appellate court reviews the district court's grant of summary judgment de novo, viewing the record in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor.[9]

[3] An appellate court independently reviews questions of law decided by a lower court.[10]

## V. ANALYSIS

### 1. Nondefamation Claims Barred by the Act

Choice argues that the district court erred in finding that the Act barred its nondefamation claims. Choice does not dispute that none of its employees were licensees. Rather, Choice asserts that the Act does not apply, because it never performed acts or rendered services prohibited by the Act or it was not subject to the Act pursuant to § 81-885.04(1).

[4] We have held that pursuant to the Act, any person collecting a fee or commission on the sale of real estate must be a licensed real estate broker or salesperson unless he or she meets one of the exceptions provided in the Act.[11] At this point, we recall specific provisions of the Act.

First, the Act prohibits lawsuits for compensation by nonlicensees. "No action or suit shall be instituted, nor recovery be had, in any court of this state by any person for compensation for any act done or service rendered, the doing

---

[8] *Bogue v. Gillis, ante* p. 445, 973 N.W.2d 445 (2022).

[9] *Id.*

[10] *Nebraska Republican Party v. Shively, ante* p. 160, 971 N.W.2d 128 (2022).

[11] *In re Estate of Ronan*, 277 Neb. 516, 763 N.W.2d 704 (2009).

or rendering of which is prohibited under [the Act] to other than [licensees]."[12]

Second, the Act broadly defines the term "broker":

Broker means any person who, for any form of compensation or consideration or with the intent or expectation of receiving the same from another, negotiates or attempts to negotiate the listing, sale, purchase, exchange, rent, lease, or option for any real estate or improvements thereon, or assists in procuring prospects or holds himself or herself out as a referral agent for the purpose of securing prospects for the listing, sale, purchase, exchange, renting, leasing, or optioning of any real estate or collects rents or attempts to collect rents, gives a broker's price opinion or comparative market analysis, or holds himself or herself out as engaged in any of the foregoing. Broker also includes any person: (a) Employed, by or on behalf of the owner or owners of lots or other parcels of real estate, for any form of compensation or consideration to sell such real estate or any part thereof in lots or parcels or make other disposition thereof; (b) who auctions, offers, attempts, or agrees to auction real estate; or (c) who buys or offers to buy or sell or otherwise deals in options to buy real estate.[13]

Third, the Act further defines a broker, associate broker, or salesperson as any person "who, directly or indirectly for another, with the intention or upon the promise of receiving any form of compensation or consideration, offers, attempts, or agrees to perform or performs any single act described in [§ 81-885.01(2)], whether as a part of a transaction, or as an entire transaction."[14] This section also declares that "[c]ommitting a single act described in [§ 81-885.01(2)] by a person

---

[12] § 81-885.06.

[13] § 81-885.01(2).

[14] § 81-885.03(1).

required to be licensed under [the Act] and not so licensed shall constitute a violation of [the Act]."[15] For convenience, we refer to the acts defined in §§ 81-885.01(2) and 81-885.03(1) as "prohibited acts" throughout the remainder of this opinion.

In order to determine whether the Act barred Choice's non-defamation claims, we must begin with two questions. Did Choice perform a prohibited act? And, if so, did Choice do so with the intent to or upon the promise of receiving any form of compensation or consideration? Then, we must determine whether the Act's exception for acts "as owner . . . with reference to property owned" by Choice applies here.[16]

[5-7] Answering these questions requires statutory interpretation, which is guided by well-settled principles. Statutory interpretation is a question of law.[17] It begins with the text, and the text is to be given its plain and ordinary meaning.[18] An appellate court will not resort to interpretation of statutory language to ascertain the meaning of words which are plain, direct, and unambiguous.[19]

We digress momentarily to note that, unlike the district court, we will consider Gillman's affidavit in our analysis. This affidavit was admitted into evidence. The court below applied *Momsen* to disregard it.[20] Although Choice does not specifically assign error to the court's application of *Momsen*, we assume, without deciding, that Gillman was a nonparty witness.[21] At oral argument, Donner conceded that Gillman was not deposed pursuant to the rule permitting identification of an organization as the deponent.[22] This court has

---

[15] *Id.*

[16] See § 81-885.04(1).

[17] *In re Estate of Severson*, 310 Neb. 982, 970 N.W.2d 94 (2022).

[18] *Nebraska Republican Party v. Shively, supra* note 10.

[19] *Id*.

[20] See *Momsen v. Nebraska Methodist Hospital, supra* note 4.

[21] See *id.*

[22] See Neb. Ct. R. Disc. § 6-330(b)(6) (rev. 2022).

repeatedly declined to extend *Momsen*[23] to instances of changed testimony by nonparty witnesses,[24] and it is not necessary to do so here.

[8,9] In reviewing the district court's grant of summary judgment, an appellate court views the pleadings and admitted evidence de novo.[25] The grant of a motion for summary judgment may be affirmed on any ground available to the trial court, even if it is not the same reasoning the trial court relied upon.[26]

### (a) Acts or Services Rendered

Choice asserts that it never performed any prohibited acts. Choice focuses upon the requirement in § 81-885.03(1) that a prohibited act must be performed "for another." Choice argues that because it was a party to the transactions, it acted in its own behalf—not "for another." For instance, Choice contends that it did not show the property to prospective buyers for another's benefit. Choice claims it did so "in anticipation of purchasing the property and then reselling it to customers who wanted Choice to build a home on the property" instead.[27] We disagree.

Choice performed a plethora of prohibited acts for the owners and buyers. It

• procured prospective buyers for the owners,
• solicited the sale of the property to the buyers,
• found the buyers' "dream property for them,"

---

23 *Momsen v. Nebraska Methodist Hospital, supra* note 4.

24 See, *Breeden v. Anesthesia West*, 265 Neb. 356, 656 N.W.2d 913 (2003); *Ketteler v. Daniel*, 251 Neb. 287, 556 N.W.2d 623 (1996). See, also, *Momsen v. Nebraska Methodist Hospital, supra* note 4.

25 See *Bogue v. Gillis, supra* note 8. See, also, *Rodriguez v. Nielsen*, 259 Neb. 264, 609 N.W.2d 368 (2000); *MAPCO Ammonia Pipeline v. State Bd. of Equal.*, 242 Neb. 263, 494 N.W.2d 535 (1993).

26 *Zawaideh v. Nebraska Dept. of Health & Human Servs.*, 285 Neb. 48, 825 N.W.2d 204 (2013).

27 Brief for appellant at 24.

• "introduce[d] the [owners and buyers],"
• "made [the buyers] aware that [it] would secure [the property]
  under a separate agreement with the [owners] for conveyance
  to [the buyers] under the terms of the purchase agreement
  between [them],"
• negotiated the sale of the property, and
• assisted the owners in "get[ting] out of [the property]."
While Choice may have been motivated to act in its own
behalf, the undisputed evidence shows that it performed these
prohibited acts for the owners and buyers. Our statutes prohibit
*any* unlicensed person (aside from those explicitly excepted
in § 81-885.04) from negotiating, attempting to negotiate, or
assisting in procuring prospects for the sale or lease of "'*any*
real estate or improvements thereon.'"[28]

(b) Compensation or Consideration

Choice asserts that it never expected to receive compensa-
tion from the owners or the buyers. Instead, Choice expected
to "realize a profit when [it] resold the property to a third
party."[29] Choice argues that if it intended to be compensated by
the owners or the buyers, the purchase agreements would have
mandated that it be paid a commission fee.

This argument lacks merit. Choice expected to receive com-
pensation under its oral agreement with the owners. Choice
agreed to purchase the property from the owners for a set price
if it "found a buyer interested in [the property]." Choice would
then "realize a profit"[30] by reselling the property to a buyer
at a higher price. In essence, Choice solicited the sale of the
property and procured a buyer for the owners in exchange for
the right to simultaneously purchase and sell the property for a
$620,000 profit.

---

[28] *Ford v. American Medical International*, 228 Neb. 226, 230, 422 N.W.2d
67, 70 (1988) (quoting § 81-885.01(2)) (emphasis in original).

[29] Brief for appellant at 24.

[30] *Id.*

[10] The Act does not mandate that a person be compensated in a specific manner such as through a commission fee in a purchase agreement.[31] All the Act requires is that a person—who is not a licensee—perform a prohibited act with the expectation that he or she will receive compensation from another.[32]

### (c) § 81-885.04(1)

The Act barred Choice's nondefamation claims unless § 81-885.04(1) applied. This statute mandates that the Act shall not apply to:

> Any person, partnership, limited liability company, or corporation who as owner or lessor shall perform any of the acts described in subdivision (2) of section 81-885.01 with reference to property owned or leased by him, her, or it or to the regular employees thereof, with respect to the property so owned or leased, when such acts are performed in the regular course of or as an incident to the management, sale, or other disposition of such property . . . .[33]

Choice asserts that it owned the property, because it obtained equitable title to the property under its purchase agreement with the owners. Because it "owned"[34] the property, it argues, the Act does not apply here. We disagree, because it claims too much.

Choice does not claim that it obtained any ownership rights in the property other than equitable title. Choice also does not claim it obtained equitable title in the property before signing its purchase agreement with the owners.

[11] If the owner of real estate enters into a contract of sale whereby the purchaser agrees to buy and the owner agrees

---

[31] See, generally, § 81-885.01 et seq.

[32] See *id.*

[33] See § 81-885.04(1).

[34] See *id*.

to sell it and the vendor retains the legal title until the purchase money or some part of it is paid, the ownership of the real estate as such passes to and vests in the purchaser, and that from the date of the contract the vendor holds the legal title as security for a debt as trustee for the purchaser.[35] While the current version of § 81-885.04(1) does not define "property owned,"[36] its plain and ordinary meaning includes equitable title.[37]

However, Choice fails to recognize that § 81-885.04(1) only applied to the prohibited acts that it performed while it owned the property. The statute only allowed Choice "as owner" to "perform any [prohibited act] with reference to property owned . . . by . . . it."[38] The exception does not apply to prohibited acts that Choice performed before or after it owned the property.

Choice "owned" the property for less than 24 hours. Choice obtained equitable title in the property through its purchase agreement with the owners. However, later that day, Choice entered into its purchase agreement with the buyers, which transferred equitable title to them.[39] Choice had no other ownership interest in the property.

Choice performed multiple prohibited acts before and after it owned the property. Choice solicited the sale of the property, sought to procure a buyer, showed the property to the buyers, attempted to facilitate the sale of the property, and negotiated with the owners and buyers to "try[] to keep the agreements between [it, the owners, and the buyers] alive."

---

[35] *DeBoer v. Oakbrook Home Assn.*, 218 Neb. 813, 359 N.W.2d 768 (1984).

[36] But see 2022 Neb. Laws, L.B. 892, § 2 (effective July 20, 2022). See, also, Neb. Const. art. III, § 27.

[37] See *Nebraska Republican Party v. Shively, supra* note 10. See, also, *DeBoer v. Oakbrook Home Assn., supra* note 35.

[38] See § 81-885.04(1).

[39] See *DeBoer v. Oakbrook Home Assn., supra* note 35.

Therefore, the court did not err in finding the Act barred Choice's nondefamation claims.

## 2. Nondefamation Claims— Alternative Findings

[12] Choice assigns that the court erred in finding that it could not prove the elements of its nondefamation claims. Because the district court correctly concluded that the Act barred Choice's nondefamation claims, we need not address this assignment. An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it.[40]

## 3. Defamation Claim Fails

Choice assigns that the district court erred in finding it could not prove the elements of its defamation claim. Before summarizing its arguments, we quote the review, and then summarize the applicable law.

(Prior to this section of our analysis, we have referred to Donner collectively in her individual and representative capacities. In this section, we are referring to Donner only in her individual capacity.)

Donner's review (which we quote exactly) stated:

> Please be careful of any contract you sign with Jason Gillman of Choice Homes. He was a great neighbor to us for many years. He sat in the man cave with my husband at our place and they shared beers. We arranged for him to park his motorhome at Nebraska football games. We the mistake of trusting him, signed a property contract with him, and when my husband suddenly passed away, Jason wants to sue me, the widow, telling me this just a few days after his passing, hoping to cash in. Please don't trust this man. Everything I have said is true, you can contact me through my Facebook account if you

---

[40] *Preserve the Sandhills v. Cherry County*, 310 Neb. 184, 964 N.W.2d 721 (2021).

need verification I can provide both our lawyers and any other proof you need.

[13,14] A defamation claim has four elements: (1) a false and defamatory statement concerning the claimant, (2) an unprivileged publication to a third party, (3) fault amounting to at least negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.[41] By statute, truth in and of itself is made a complete defense unless the plaintiff proves the statements were made with actual malice.[42]

[15] The question of whether a particular publication is defamatory is, in the first instance, a question of law for the court.[43] As noted in the standard of review section, we review questions of law de novo.

[16,17] The threshold question in a defamation suit is whether a reasonable fact finder could conclude that the published statements imply a provably false factual assertion.[44] Statements of fact can be defamatory whereas statements of opinion—the publication of which is protected by the First Amendment—cannot.[45] Put another way, "'subjective impressions'" cannot be defamatory, as contrasted with objective "'expressions of verifiable facts.'"[46]

However, the U.S. Supreme Court has discouraged the practice of dividing a speaker's statements into "opinion" or "fact" and only considering whether the latter statements

---

[41] *JB & Assocs. v. Nebraska Cancer Coalition*, 303 Neb. 855, 932 N.W.2d 71 (2019).

[42] *Bartels v. Retail Credit Co.*, 185 Neb. 304, 175 N.W.2d 292 (1970). See, also, § 25-840.

[43] *Wheeler v. Nebraska State Bar Assn.*, 244 Neb. 786, 508 N.W.2d 917 (1993).

[44] *Steinhausen v. HomeServices of Neb.*, 289 Neb. 927, 857 N.W.2d 816 (2015).

[45] *Id.*

[46] *Id.* at 940, 857 N.W.2d at 828.

are actionable. [47] The Court explained that there is not a "wholesale defamation exemption for anything that might be labeled ʹopinion.ʹ"[48] Even if the speaker states the facts upon which the speaker bases his or her opinion, if those facts are either incorrect or incomplete, or if his or her assessment of them is erroneous, the statement may still imply a false assertion of fact.[49]

[18] Thus, shortly after the high court's explanation, this court recognized that language must be evaluated in its broader context to assess whether a reader would have understood the allegation to be a statement of fact.[50] As we then stated, in determining whether a statement implies a provably false factual assertion, both the language of the statement and the context in which the statement was made must be examined.[51]

[19] To distinguish fact from opinion in a defamation claim, courts apply a totality of the circumstances test. Relevant factors include (1) whether the general tenor of the entire work negates the impression that the defendant asserted an objective fact, (2) whether the defendant used figurative or hyperbolic language, and (3) whether the statement is susceptible of being proved true or false.[52]

[20,21] Context is important to whether an ordinary reader would view a statement as one of fact or opinion.[53] In addition to the content of the communication, a court looks to the knowledge, understanding, and reasonable expectations

---

[47] See *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 110 S. Ct. 2695, 111 L. Ed. 2d 1 (1990).

[48] See *id.*, 497 U.S. at 18. See, also, *Wheeler v. Nebraska State Bar Assn.,* supra note 43.

[49] *Milkovich v. Lorain Journal Co., supra* note 47.

[50] See *Wheeler v. Nebraska State Bar Assn., supra* note 43.

[51] *Id.*

[52] *Steinhausen v. HomeServices of Neb., supra* note 44.

[53] *Id.*

of the audience to whom the communication was directed, taking cues from the broader setting in which the statement appears.[54] Words, particularly the pejorative ones, often have both a literal and figurative meaning.[55] As noted, whether the language is hyperbolic is relevant to distinguishing fact from opinion.[56] Rhetorical hyperbole—language that, in context, was obviously understood as an exaggeration, rather than a statement of literal fact—is not actionable.[57]

With these principles in mind, we turn to Choice's arguments, some of which appear only in the summary of argument portion of its brief. As best we can discern, its main argument seems to be that the district court failed to view Donner's review in its totality. However, we apply de novo review to the question of whether a statement is defamatory. Thus, it matters not how the trial court analyzed the review if it reached the right result.[58]

Choice argues Donner's statements of fact that were undisputedly true should be considered defamatory, because it did not need to prove malice. Choice contends that a plaintiff only needs to prove malice if it is a public figure. But Donner's motion for partial summary judgment also placed her affirmative defense before the court. And as we recognized above, by statute truthful statements are not actionable unless made maliciously.[59]

Choice also argues that Donner's review was defamatory, because she provided insufficient context for their interactions. In this regard, Choice argues that Donner failed to inform

---

[54] *Id.*

[55] *Id.*

[56] *Id.*

[57] *Id.*

[58] See *Zawaideh v. Nebraska Dept. of Health & Human Servs., supra* note 26.

[59] See *JB & Assocs. v. Nebraska Cancer Coalition, supra* note 41. See, also, § 25-840.

the reader that she and Jackson "breached the agreement," "[k]nowing that they cited a false reason for refusing to close [which] painted Choice and [Gillman] as violating a close trusting relationship and taking advantage of a widow in a moment of weakness."[60] Choice then asserts that "[t]he average person reading [Donner's review] would be left with an impression that signing a [purchase] agreement with [Choice] and [Gillman] could subject a person to being unfairly sued in order for [C]hoice to 'cash in' on the agreement."[61]

Along the same line, Choice contends Donner's invitation to the reader to "contact" her for "additional information" "implies that she has more defamatory information which she is willing to share."[62] This, Choice argues, "distinguishes her [review] from protected opinion."[63] We address this implication argument along with the preceding contextual argument.

To determine whether Choice could prove the elements of defamation, we must determine what statements, if any, by Donner were false and defamatory. Because there is no evidence in the record to prove that Donner published her review with malice, her statements of fact that were undisputedly true did not defame Choice.[64]

Therefore, in analyzing Choice's defamation claim, we only consider Donner's statements that were not proved to be entirely undisputedly true. Such statements are as follows:

• "Please be careful of any contract you sign with . . . Gillman of Choice."
• "We the mistake of trusting him, signed a property contract with him, and when [Jackson] suddenly passed away,

---

[60] Brief for appellant at 36.

[61] *Id.*

[62] *Id*. at 21.

[63] *Id.*

[64] See *Steinhausen v. HomeServices of Neb., supra* note 44. See, also, § 25-840.

[Gillman] wants to sue me, the widow, telling me this just a few days after [Jackson's] passing, hoping to cash in."
• "Please don't trust this man."
• "Everything I have said is true, you can contact me through my Facebook account if you need verification I can provide both our lawyers and any other proof you need."

In reviewing these statements, we consider the context of their publication and look to the knowledge, understanding, and reasonable expectations of the audience to whom the communication was directed, taking cues from the broader setting in which the statement appears.

In these statements, Donner used hyperbolic language to express her subjective skepticism of Gillman's trustworthiness. Donner then concluded her review by reaffirming that her earlier statements of fact were undisputedly true and offering to discuss the matter with the reader privately. An ordinary reader would understand these statements to be Donner's opinions.

Donner's opinions did not imply a false statement of fact. Donner expressed her disfavor in Gillman for "want[ing] to sue" her, but she never implied that she was being "unfairly sued."[65] Donner never claimed that she had no fault in failing to close on the purchase agreement. Donner never alleged that the only reason Gillman "want[ed] to sue" her was because she was a widow. Nor did Donner imply that the reader would suffer the same fate as her. Therefore, an ordinary reader would not infer that he or she would be "unfairly sued" simply by "signing a [purchase] agreement" with Choice.[66]

We find Donner did not state or imply any false statements of fact in the review. Therefore, the district court did not err in finding that Choice could not prove the elements of its defamation claim.

---

[65] Brief for appellant at 21.

[66] *Id.*

## VI. CONCLUSION

The Act barred Choice's nondefamation claims, because Choice sought to recover compensation for performing prohibited acts while not being a licensee. Additionally, Choice was not defamed by the review, because it did not state or imply a false statement of fact. We affirm the judgment of the district court.

Affirmed.

Miller-Lerman, J., not participating.