KARL E. MOMSEN, ADMINISTRATOR OF THE
ESTATE OF INEZ G. MOMSEN, DECEASED,
APPELLANT AND APPELLEE, V.
NEBRASKA METHODIST HOSPITAL ET AL., APPELLEES,
AND JAMES R. KOVARIK, M.D., APPELLANT.

313 N.W.2d 208

Filed December 4, 1981. No. 43522.

Joe P. Cashen and Neil B. Danberg, Jr., of Kennedy, Holland, DeLacy & Svoboda for appellant Kovarik.

Martin A. Cannon of Matthews & Cannon, P.C., for appellee Momsen.

Law Offices of Sodoro, Daly & Sodoro for appellee Nebraska Methodist Hospital.

Heard before KRIVOSHA, C.J., BOSLAUGH, McCOWN, CLINTON, BRODKEY, WHITE, and HASTINGS, JJ.

CLINTON, J.

This is an action by the personal representative of the estate of Inez G. Momsen (hereinafter Mrs. Momsen, patient, or personal representative) against defendants James R. Kovarik, a doctor of medicine specializing in obstetrics and gynecology, and the Nebraska Methodist Hospital to recover damages for the death of the patient alleged to have been caused by the negligence of the defendants. The cause was submitted to a jury which rendered a verdict in favor of both defendants. Upon the motion of the personal representative for a new trial, the district judge granted a new trial as to Kovarik and denied the motion as to the hospital. Kovarik appeals from the order granting a new trial. The personal representative appeals from the denial of the new trial as to the hospital. We affirm.

The principal issue in the Kovarik appeal is whether the trial court should have directed a verdict against Kovarik as to certain allegations of negligence because of

changes Kovarik made in his testimony at trial from that to which he testified in a pretrial deposition.

Before discussing the issue with particularity, it is necessary to set forth background information. On the afternoon of November 29, 1974, Kovarik performed a hysterectomy on Mrs. Momsen at the Nebraska Methodist Hospital. At 9 p.m. on the 29th she suffered a cardiac arrest. Resuscitation efforts were only partially successful, and at about 4:25 a.m. on the 30th she died. The autopsy indicated that the death was the result of pulmonary edema.

The petition alleged, among other claimed negligent acts or omissions, that Kovarik failed to "(a) . . . attend decedent and to provide immediate medical evaluation or diagnosis to decedent when he knew or should have known she was suffering from respiratory distress and pulmonary edema; (b) . . . provide adequate and timely medical treatment to decedent for such respiratory distress and pulmonary edema; . . . (h) . . . timely provide qualified medical care or consultation."

The evidence showed that Mrs. Momsen was, except for the complaints which necessitated surgery, in good health. After the surgery she was returned to her hospital room from the recovery room at 4:30 p.m. Prior to that time and up until 6 p.m., all vital signs were normal under the circumstances. The pulse rate varied from 68 to 76 per minute; respiration, 16 to 18 per minute; and blood pressure, 122/90 to 110/66. At 6 p.m. the patient's blood pressure dropped to 90/60. This, however, was no cause for immediate concern. A lowered blood pressure is a normal reaction to a pain-killing drug such as that which the patient had been given at about 4:50 p.m. The patient's breathing at 6:30 p.m., however, was very "moist," and the nurse used suction to remove fluid from her throat intermittently throughout the evening. There was no significant change in the vital signs until 7:15 p.m. when the pulse rate rose to 160 and the blood pressure dropped to 80/60. The attending nurse measured vital signs

every 15 minutes. Thereafter, the vital signs and other symptoms were as follows: 7:30 p.m., pulse, 160; respirations, 52; blood pressure, 76/60. At that time the patient's nails were blue, indicating a deficiency of oxygen in the bloodstream. The nurse testified that at that time she called Kovarik at his home and advised him of the changes in the patient's condition. As Kovarik felt hemorrhage was a likely cause for the changes in vital signs, he requested a hematocrit, a laboratory test which would indicate whether hemorrhage was occurring. He asked the nurse to telephone him when the results were known. He further told her to increase the intravenous fluid flow and to watch the patient closely. The nurse ordered the test and continued monitoring the patient's vital signs every 15 minutes. At 7:45 these were: pulse, 150; respirations, 48; blood pressure 76/60. At 8 p.m.: pulse, 160; respirations, 52; blood pressure 70/40. The nurse testified she called Kovarik at 8 p.m. and gave him the hematocrit result, which was 53 percent, as well as the vital signs information. This result indicated no hemorrhaging. He then told her to continue to watch the patient closely. Kovarik's recollection was somewhat hazy. He thought he had called for the hematocrit results himself sometime between 8 and 8:20 p.m. rather than the nurse calling him as he had requested. In any event, he did not go to the hospital until he received a call from the nurse at about 9:05 p.m. advising him of the cardiac arrest. Kovarik then left home for the hospital, arriving just as the resuscitation team was moving Mrs. Momsen from her room to the intensive care unit.

Various expert witnesses were called by the parties. The personal representative's witnesses, an anesthesiologist and a surgeon, testified that when the 7:30 p.m. vital signs information was given to Kovarik he should have gone at once to the hospital to examine the patient and to attempt a diagnosis. In their opinion all the symptoms, viewed in totality, indicated pulmonary

edema which could have been diagnosed if an examination of the patient would have been made at that time. Kovarik's expert witness, an obstetrician and gynecologist practicing in Omaha, testified on direct examination that Kovarik's responses "would be consistent with the medical judgment of a person practicing obstetrics and gynecology in Omaha." On cross-examination this witness agreed the symptoms at 7:30 p.m. indicated the patient's oxygen exchange was impaired. With reference to a physician's duty to personally attend a patient, the substance of his testimony, again elicited on cross-examination, was that, "under ideal circumstances," after receiving the information at 7:30 p.m. and ordering the hematocrit, the more efficient action would be to go to the hospital, but that "each person has to exercise the medical judgment that he has" under the circumstances. He testified:

"Q . . . If you were the doctor in this case, sir, and got that information, now you tell me true, wouldn't you have got in your car and gone to that Methodist Hospital right then and there?

"A I am not certain. It depends on the information that I received, the laboratory report that I received and how you would approach it from this point.

"Q All right, but you certainly will agree that the best care would involve getting over there to your patient right then and there?

"A I think, at the bottom line, after it is all done, any one of us would have done that, yes."

The witness' attention was then directed to his own deposition given earlier, indicating that the information showed the patient was getting into difficulty, and then he testified as follows:

"A She was in difficulty, yes.

"Q And continuing: 'If the patient were progressing to get into difficulty that either I as a physician or some[one] designated would be asked to see the patient.' That was your testimony in your deposition, is that

right?

"A Yes, sir."

He agreed at that time an undiagnosed medical problem existed.

The defendant hospital called as witnesses two anesthesiologists, one practicing in Omaha and one in Texas. The first witness testified that the pulse rate of 160 recorded at 7:15 p.m. was "alarming," and when considered with the earlier blood pressure drop to 90/60, it indicated a condition of "borderline shock"; that the continued pulse rate of 160 did not indicate stabilization of the patient's condition and the problem needed attention at once; and that if he had gotten "those numbers" he would have felt compelled to go to the hospital immediately. He stated, "There is no substitute for seeing the patient yourself."

The Texas anesthesiologist testified that the symptoms and vital signs most likely indicated pulmonary edema.

The opinions of the experts differed somewhat as to the cause of the respiratory problems as well as the treatment to be applied, as that depended upon the cause. The Omaha anesthesiologist believed the problem was a result of stomach acid which came up and was then breathed into the lungs. If such was the case, the necessary treatment would require the acid be removed from the lungs before positive pressure oxygen was given to treat the edema. Other experts, except the Texas anesthesiologist, thought the edema resulted from a fluid overload. In this event, the proper treatment would be giving oxygen under positive pressure, along with various other measures.

The experts' opinions differed as to the salvageability of the patient's life if early treatment had been rendered after the symptoms appeared. The personal representative's expert indicated Mrs. Momsen could have been saved even as late as 8:30 p.m. or later, while the others indicated the question was unanswerable without significant speculation.

Kovarik's expert indicated, as did the personal representative's experts, that the symptoms called for treatment by either an anesthesiologist or an internal medicine specialist, not an obstetrician-gynecologist. Kovarik himself agreed he could not treat pulmonary edema, but he thought he could diagnose it if he saw a patient so afflicted.

We now turn to Kovarik's testimony concerning the central question of whether the treating physician should have gone to the hospital for purposes of making an examination and attempting diagnosis after the information on symptoms was first received.

As to the information he received in the two conversations with the attending nurse, he testified as follows. First conversation:

"Q Do you recall whether she gave you the information that was contained in the nurse's notes, generally that she had a problem with coughing?

"A Yes, she did.

"Q And —

"A (Interposing) As far as I can recall, she did.

"Q And nasal and throat suction; that she was undertaking suction at that time?

"A That's correct.

"Q Do you recall that she indicated that there was some chest sounds and possibly the nail beds were blue; do you recall that?

"A Yes.

"Q And how about the vital signs?

"A She said she told me and I can't dispute that she may have told me, but I don't remember. I just can't recollect that we talked about that specifically, and she may well have had."

Second conversation:

"A I am sure she did but, again, I can't recall that she did, but I am sure it would have been illogical to even think that either the nurse or I wouldn't have asked or that she wouldn't have told me.

"Q And at that time you told her to continue what she

was doing?

"A Yes, sir.

"Q It was your impression that she was doing better from what she told you, is that correct?

"A She was doing better according to Miss Redding.

"Q Did you give any other instructions, specific instructions, one way or the other to continue doing what she was doing and watch her closely?

"A Again, I don't remember any specific thing, but the logical thing for me to do was say, 'Watch her closely and let me know if there is any change.'

"Q And, as far as your being free to go to the hospital, was there anything to keep you from going to the hospital at that time?

"A Nothing."

The gist of Kovarik's reason for not going to the hospital, according to his testimony at trial, was that since the results of the hematocrit did not indicate bleeding and bleeding was the most obvious post-operative problem, and since she was a little better (this refers to the nurse's statement that she was coughing better) and "she wasn't any worse than she was before" (the vital signs had not changed), "I elected again, in my medical judgment, to sit tight."

In the deposition Kovarik stated that he had not been given the vital signs by the nurse on any occasion, and that if he had he would have gone to the hospital immediately because the vital signs indicated a "serious condition." When asked how he reconciled his trial testimony with that given in his pretrial deposition, he said, "I can't."

As previously mentioned, Kovarik testified at trial that in the exercise of his professional judgment it was not necessary to see the patient. If Kovarik is bound by his admissions in the deposition, and the conflicting trial testimony of Kovarik is disregarded, then the testimony of all the experts is unanimous, i.e., given Kovarik's admitted knowledge of the patient's symptoms at 7:30 p.m., their serious nature, and his

admitted availability, proper care of the patient required him to go to the hospital, examine the patient, and attempt a diagnosis.

The question raised with reference to the effect of Kovarik's testimony in his deposition is whether, under the circumstances of this case, the admissions bind him or simply go to the issue of his credibility. Similar questions have been discussed many times before by this court and some distinctions have been made. In *Kirchner v. Gast,* 169 Neb. 404, 416, 100 N.W.2d 65, 74-75 (1959), we said: "Those cases where we have held the statements to be judicial admissions have been where it is patent that the witness deliberately changed his testimony to meet the necessities of the case, and where the change has been unexplained, or is unexplainable on any rational basis. We have then held it to be a matter of law, but otherwise it is a question of credibility for the trier of facts." The above rule has been reiterated many times, although not always applicable to the issue in the particular case in which the discussion took place. In *Sacca v. Marshall,* 180 Neb. 855, 868, 146 N.W.2d 375, 383 (1966), we said, in distinguishing other cases: "The foregoing cases adopted the rule that where a plaintiff, without reasonable explanation, testifies to facts materially different concerning a vital issue, the change clearly being made to meet the exigencies of the pending action, the evidence is discredited as a matter of law and should be disregarded." In *Insurance Co. of North America v. Omaha Paper Stock, Inc.,* 189 Neb. 232, 234-35, 202 N.W.2d 188, 190 (1972), we said: "In connection with the contradictory statements of witnesses, we call attention to Clark v. Smith, 181 Neb. 461, 149 N.W.2d 425, wherein it is held: 'Where a party without reasonable explanation testifies to facts materially different concerning a vital issue, the change clearly being made to meet the exigencies of pending litigation, such evidence is discredited as a matter of law and should be disregarded." See, also, *Beshaler v. Helberg,* 187 Neb. 584, 193 N.W.2d 261 (1971).

In *Nichols v. McArdle*, 170 Neb. 382, 102 N.W.2d 848 (1960), the defendant had testified in an earlier suit against him, arising out of the same automobile accident but involving a different plaintiff, that he had been rendered unconscious and did not know whether he had stopped at a traffic sign before entering the intersection. In the cited case he testified that he had brought his car to a halt at the stop sign before entering the intersection. We held as follows: "He offered no explanation of the contradictory and inconsistent testimony given by him in the two cases. The assertion made on the trial of this case by appellant that he stopped his automobile at the stop sign before he entered upon the highway is not, under the circumstances, available to him in this litigation. A litigant may not recite upon oath one statement of fact in one judicial proceeding and thereafter, to meet the exigencies of the case in the trial of a different cause, recite an entirely different and inconsistent story. In such a situation the evidence is discredited as a matter of law and will be disregarded." *Id.* at 395-96, 102 N.W.2d at 856.

It is argued by Kovarik the rule applies only where, in a later trial on the same set of facts, the witness changes his testimony to obviate objections pointed out on appeal. See *Peterson v. Omaha & C. B. Street R. Co.*, 134 Neb. 322, 278 N.W. 561 (1938), where we said: "Testimony of a witness [the plaintiff] on a vital point in a case, materially changed to obviate objections pointed out by this court on a former appeal, without any sufficient explanation given, is discredited as a matter of law, and will be disregarded." (Syllabus of the court.) That is one application of the rule, but as a matter of substance we see no difference whether the issue rises in a retrial of the same case or in the trial of a related case, as in *Nichols, supra.* Neither is its application limited to plaintiffs. See *Nichols, supra.* In principle, there is no difference between the use of deposition testimony in the same case and the use of testimony from a former

trial related to the same matter. The important considerations are that the testimony pertains to a vital point, that it is clearly apparent the party has made the change to meet the exigencies of the pending case, and that there is no rational or sufficient explanation for the change in testimony. The rule would not, for example, necessarily apply in an automobile case where a party in his deposition testifies to his estimate of certain distances and then before trial, after a visit to the scene and viewing landmarks, makes measurements and changes his estimates.

We now return to the issue of the directed verdict. The patient's symptoms, their seriousness, the doctor's knowledge thereof, and his opportunity to examine and diagnose are undisputed. Should the jury have been instructed that the defendant was negligent as a matter of law in not going to the hospital, making a personal examination of the patient, and making attempts at further diagnosis? We hold that such instructions should have been given. We have recently said: "A patient is entitled to an ordinarily careful and thorough examination such as the circumstances, the condition of the plaintiff, and the physician's opportunities for examination will permit, and, while he does not insure the correctness of his diagnosis, a physician or surgeon is required to use reasonable skill and care in determining through diagnosis the condition of the patient and the nature of the ailment, and is liable for a failure, due to want of the requisite skill or care to diagnose correctly the nature of the ailment, with resulting injury or detriment to the plaintiff." *Anderson v. Moore*, 202 Neb. 452, 464, 275 N.W.2d 842, 849 (1979). In *Revels v. Pohle*, 101 Ariz. 208, 211, 418 P.2d 364, 367 (1966), the Supreme Court of Arizona said: " ' "The law thus requires a surgeon to possess the skill and learning which is possessed by the average member of the medical profession in good standing, and to apply that skill and learning with ordinary and reasonable care. *He is not liable for mere error of judgment provided he*

*does what he thinks is best after a careful examination.* * * * "'" (Emphasis added.)

"The key words in the above quotation are 'provided' and 'after.' One does not have to be a doctor to know that due care was not exercised if a physician acts without giving a thorough and careful examination, such as the condition of the patient and attending circumstances will permit."

In *Katsetos v. Nolan,* 170 Conn. 637, 654, 368 A.2d 172, 182 (1976), the Supreme Court of Connecticut said: "We have not previously had occasion to consider the duty of a physician to remain in attendance upon a patient in critical condition. We now follow the general rule that in the absence of an emergency or special circumstances 'a physician is under the duty to give his patient all necessary and continued attention as long as the case requires it, and that he should not leave his patient at a critical stage without giving reasonable notice or making suitable arrangements for the attendance of another physician.'" See, also, *Thomas v. Corso,* 265 Md. 84, 288 A.2d 379 (1972).

The particular issue we are discussing did not, in the last four cited cases, arise in the context of whether a verdict should have been directed against the doctor. However, where the facts are not in dispute, then ordinarily the evidence should be taken as true. *Morris v. Equitable Life Assurance Society,* 109 Neb. 348, 191 N.W. 190 (1922).

In the case before us, there is no dispute about the central facts. Kovarik had knowledge of the patient's symptoms and their serious nature. He did not go to the hospital to make a personal examination and attempt further diagnosis. There was nothing to prevent him from so doing. He was negligent as a matter of law in these respects. The additional questions of negligence concerning failure to make a proper diagnosis, failure to consult a specialist, and proximate cause of the death of the patient are for the jury. The lower court did not err in granting the personal representative a new trial

as to Kovarik.

The appeal as to the defendant Nebraska Methodist Hospital may be dealt with rather summarily. The claims of negligence against it are primarily that it failed to procure another physician when Kovarik did not come to the hospital and that it failed to have a doctor available in the hospital to cover in such circumstances. We have read the record. These and other issues were jury questions and have been decided by the jury. No prejudicial error appears. The trial court was correct in not granting the motion for a new trial as to the hospital.

AFFIRMED.

KRIVOSHA, C.J., concurs in result.