IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


DUERFELDT V. PLOEGER


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


DALE E. DUERFELDT AND CAROL J. DUERFELDT, APPELLEES,
V.
VERA J. PLOEGER AND CAROL J. HAMILTON, APPELLANTS, AND STATE OF NEBRASKA,
GAME, FORESTATION AND PARKS COMMISSION, APPELLEE.


Filed February 6, 2024.    No. A-23-172.


Appeal from the District Court for Richardson County: JULIE D. SMITH, Judge. Affirmed.

David A. Domina, of Domina Law Group, P.C., L.L.O., and Douglas E. Merz, of Weaver & Merz, for appellants.

Terry C. Dougherty and Todd W. Weidemann, of Woods Aitken, L.L.P., for appellees Dale E. Duerfeldt and Carol J. Duerfeldt.

Michael T. Hilgers, Attorney General, and Carlton W. Wiggam for appellee State of Nebraska.


PIRTLE, Chief Judge, and BISHOP, Judge.

BISHOP, Judge.

## I. INTRODUCTION

Elizabeth Esther Duerfeldt (Esther) and Elmer Duerfeldt (Elmer), a married couple, acquired numerous parcels of real property prior to Elmer's passing in 2006. After Elmer's death, Esther disclaimed a ½ interest in some of the real property, which resulted in a ⅛ interest of that property passing to each of Esther's and Elmer's four children: Dale Duerfeldt (Dale), Vera Ploeger, Carol Hamilton, and Judy Burgett; Esther retained the other ½ interest.

In May 2018, Esther sold her ½ interest in nine parcels of property to Dale and his wife, Carol Duerfeldt (Carol), for $1,127,500. Dale and Carol (hereafter jointly "the Duerfeldts")

- 1 -

subsequently filed a complaint to partition the nine parcels of property, to terminate severed mineral interests, and to quiet title. Dale's siblings challenged ownership of the ½ interest Esther sold to the Duerfeldts, claiming the sale was void because of undue influence, fraud, or mistake. The Duerfeldts filed a motion for summary judgment asking the Richardson County District Court to find that the partition of the real estate should be executed. The district court granted summary judgment, concluding that the Duerfeldts made a prima facie case that they were entitled to a partition, and that there was no genuine issue of material fact concerning the validity of the land contract and deeds related to the 2018 transaction. Ploeger and Hamilton appeal, challenging evidentiary rulings and the grant of summary judgment in favor of the Duerfeldts. We affirm.

## II. BACKGROUND

When Esther sold her ½ interest in nine parcels of property to the Duerfeldts for $1,127,500 in May 2018, a "Contract for Sale of Real Estate," "Deed of Trust," and a "Joint Tenancy Warranty Deed" were executed. A few months later, in September, the Duerfeldts filed a "Complaint for Partition, to Terminate Severed Mineral Interest and to Quiet Title." Named defendants included Ploeger, Hamilton, Burgett and her husband, the "State of Nebraska, Game, Forestation and Parks Commission" (the State), "Harlan D. Lewis and Vivian Lewis" (the Lewises), and other persons "Real Names Unknown" who had any interest in the property at issue or the severed mineral interests in a particular property.

In their complaint, the Duerfeldts identified nine parcels of real property in Richardson County, Nebraska, and asserted that Dale and his three sisters each owned an undivided ⅛ interest in the property, and that the Duerfeldts owned an undivided ½ interest in the property (with Esther having a lien on the Duerfeldts' interest by virtue of a Deed of Trust in the amount of $1,127,500). Those nine parcels of land, which we have numbered for later reference, were described as follows:

[1.] Sl/2 SWl/4 and SWl/4 SEl/4, Section 32, Township 3 North, Range 17, East of the 6th P.M., Richardson County, Nebraska;

[2.] SEl/4 SWl/4, SWl/4 SEl/4, El/2 SEl/4 and SEl/4 NEl/4, EXCEPT that portion condemned by the State of Nebraska for a State Park as shown by return of appraisers Tract 11 recorded in Book 7, Miscellaneous, Page 307, Section 8, Township 3 North, Range 17, East of the 6th P.M., Richardson County, Nebraska;

[3.] Wl/2 Wl/2 NWl/4 NWl/4 (being Lot 8), Section 16, Township 3 North, Range 17, East of the 6th P.M., Richardson County, Nebraska;

[4.] Nl/2 NEl/4, NEl/4 NWl/4, El/2 NWl/4 NWl/4, SWl/4 NEl/4, NWl/4 SEl/4 and North 30 acres of the SEl/4 NEl/4,
and

[5.] Wl/2 NWl/4 NEl/4 SWl/4, Being 5 acres of land, NWl/4 SWl/4, SEl/4 SWl/4 and 9 acres off the South end of Wl/2 NEl/4 SWl/4, El/2 SWl/4 NWl/4 and SEl/4 NWl/4, all in Section 17, Township 3 North, Range 17, East of the 6th P.M., Richardson County, Nebraska;

[6.] SEl/4, Section 18, Township 3 North, Range 17, East of the 6th P.M., Richardson County, Nebraska; EXCEPT one acre of land beginning at a point 26 rods west of the Southeast comer of the SEl/4 SEl/4 of Section 18, Township 3 North, Range 17 East of the 6th P.M., Richardson County, Nebraska, thence west along the south line of said

- 2 -

quarter section 16 rods, thence due north 10 rods, thence due east 16 rods, thence south 10 rods to the place of beginning;

[7.] Sl/2 NEl/4 and a tract of land described as follows: commencing at the Northwest corner of the Northwest Quarter of the Northeast Quarter of aforesaid section, from thence South eighty rods, from thence East thirty-three rods, from thence to a stake forty-five rods and seven feet North and one rod West, from thence to a stake thirty rods West and seven rods and two feet North, from thence North twenty-seven rods seven feet and six inches, from thence West two rods to place of beginning, all in Section 18, Township 3 North, Range 17, East of the 6th P.M., Richardson County, Nebraska;

[8.] Part of the NWl/4 NWl/4 lying north of the county road, Section 21, Township 3 North, Range 17, East of the 6th P.M., Richardson County, Nebraska;

[9.] El/2 NWl/4, less land deeded to the State of Nebraska for highway right-of-way. Section 17, Township 2 North, Range 16, East of the 6th P.M., Richardson County, Nebraska[.]

The Duerfeldts also asserted that the State appeared of record to be the owner of an undivided ½ mineral interest in parcel 2 above, and that the Lewises (or other persons names unknown) appeared of record to have a mineral reservation of an "undivided ½ interest in all oil, gas and other mineral" in parcel 9 above. The Duerfeldts specifically elected not to make creditors parties to the proceeding, acknowledging that Esther had a lien upon their interest in the real estate by virtue of the Deed of Trust in the amount of $1,127,500. See Neb. Rev. Stat. § 25-2172 (Reissue 2016) (creditors having specific or general lien upon all or any portion of property may or may not be made parties, at option of plaintiff).

The Duerfeldts' first cause of action sought partition of the nine parcels of property. They alleged that the property was not susceptible to a division in kind, and that a sale of the property and the division of proceeds among the owners was necessary. Their second cause of action sought the termination of severed mineral interest, alleging that there were of record "no filings of any type regarding the severance mineral interest" in parcel 9 since the recording of the Deed reserving the mineral interest of March 29, 1961. Their third cause of action sought to quiet title to the nine parcels of property. The Duerfeldts prayed:

[T]hat the Court enter an Order of Judgment quieting title of the [nine parcels of] real estate as above-described, terminating any severed mineral interest pursuant to Neb. Rev. Stat. § 57-228 et al. except those held by the State of Nebraska and ordering the partition of the real estate as above described, according to the respective rights and shares of the parties as aforesaid; for the appointment of a Referee; for the sale of the property and the division of the proceeds of the sale among the parties, according to their respective interests; for costs expended herein; for attorney's fees pursuant to Neb. Rev. Stat. § 25-21,108; and for such other and further relief as the Court may deem just and equitable in the premises.

In their answer and amended cross-complaint, Ploeger and Hamilton alleged that the ½ interest in the nine parcels claimed by the Duerfeldts was "obtained as the result of undue influence, fraud, mistake, or violation" of Dale's "influential and confidential relationship" with

Esther, the result of which is that "said conveyance had no legal affect and is void." In their cross-complaint they added Esther as a defendant and alleged six causes of action; three of those causes of action were subsequently severed. The three remaining causes of action related to the need to quiet title to and partition parcels of real estate (including additional parcels of real estate not included in the Duerfeldts' complaint), including by sale if such could not be equitably divided; the operation of oil wells; and Esther's estate plan.

In their answer and cross-complaint, Burgett and her husband similarly alleged that the ½ interest in the nine parcels of property claimed by the Duerfeldts was "obtained as the result of undue influence, fraud, mistake, or violation" of Dale's "influential and confidential relationship" with Esther, the result of which is that "said conveyance had no legal affect and is void." In their cross-complaint they also added Esther as a defendant and alleged that Esther owned a ½ interest in the parcels set forth in the Duerfeldts' complaint, and that each of the four siblings owned a ⅛ interest of the parcels. Burgett and her husband sought to quiet title to and partition parcels of real estate (including additional parcels of real estate not included in the Duerfeldts' complaint), including by sale if such could not be equitably divided.

On November 15, 2021, the Duerfeldts filed a motion for summary judgment, alleging there was no genuine issue as to any material fact in the case and they were entitled to judgment as a matter of law related to the partition of the real estate being executed. Ploeger and Hamilton filed a motion to continue the motion for summary judgment "for the reason there are unresolved discovery issues and other pending matters still remaining outstanding" in the case.

On February 25, 2022, Ploeger and Hamilton filed a motion to issue a subpoena for Esther's medical records from January 1, 2006, through December 31, 2018. They alleged that the medical records would "disclose the medical condition and circumstances, and the impact thereof on the capacity and vulnerability to undue influence of Esther." In an order entered on April 24, 2022, the district court overruled the motion, finding that Esther's medical records were subject to and protected by the physician-patient privilege under Neb. Rev. Stat. § 27-504 (Reissue 2016).

On August 11, 2022, Esther's attorney filed a notice and suggestion of death stating that Esther passed away on June 6. On August 25, Ploeger and Hamilton filed a motion, which was granted, to revive the action, requesting that the action against Esther survive and proceed against the co-personal representatives of her estate, who should be substituted as parties in the stead of Esther; the co-personal representatives being Dale and his daughter Stacy A. Bailey.

On August 25, 2022, the Duerfeldts filed an amended motion for summary judgment, seeking judgment as a matter of law related to the partition of the real estate being executed. In response, Ploeger and Hamilton filed a motion requesting that the district court schedule the hearing on the Duerfeldts' amended motion for summary judgment after certain events occurred. They sought to procure Esther's medical records and noted that her privilege as to such records expired upon her death. Ploeger and Hamilton contended that the discovery requested was necessary to permit them to fully and effectively respond to the motion for summary judgment because the medical records would "bear proof that either advances or diminishes concerns about [Esther's] vulnerability to undue influence, and testamentary capacity, as well as her vulnerability to mistakes in connection with the execution of Deeds upon which title relies in this proceeding."

A hearing on the motions was held on October 11, 2022. In support of their motion, Ploeger and Hamilton offered into evidence Hamilton's September 2022 affidavit (exhibit 55) and their

attorney's September 2022 affidavit (exhibit 56). The Duerfeldts objected to exhibit 55 because it contained "a vast number of statements and documents which are completely contrary to testimony that Ms. Hamilton gave at their [sic] deposition in this case," and thus should be excluded pursuant to *Momsen v. Nebraska Methodist Hospital*, 210 Neb. 45, 313 N.W.2d 208 (1981). As to exhibit 56, the Duerfeldts argued that it referenced testimony from exhibit 55 and contained conclusions of law rather than actual proof of facts. In support of their objections, the Duerfeldts offered exhibits 32 and 33, excerpts of Hamilton's and Ploeger's October 2020 depositions; exhibits 32 and 33 were received without objection. The court received exhibits 55 and 56 but said "if after reviewing the other exhibits the Court determines that the Momsen case applies, then the Court can disregard the contents of Exhibit 55." The court also received evidence on the amended motion for summary judgment but indicated that it would first decide Ploeger's and Hamilton's motion before deciding the summary judgment motion.

On October 28, 2022, the district court entered an "Order Denying Motion to Schedule Motion for Summary Judgment After Discovery." The court stated that Ploeger and Hamilton sought to delay the hearing on the amended motion for summary judgment so they could obtain Esther's medical records posthumously. The court found that Esther's medical records were not relevant for any other purpose except for the first element of the undue influence claim, and that if the Duerfeldts can "show no genuine issue of material fact on just one of the other three elements of undue influence such that they are entitled to judgment as a matter of law, then the medical records, which relate only to the first element, become immaterial." The court overruled Ploeger's and Hamilton's motion. However, the court further explained:

> After briefs are received, when the Court analyzes [the Duerfeldts'] Amended Motion for Summary Judgment, if there is a possibility that the contents of [Esther's] medical records could provide evidence of a genuine dispute of a material fact, the Court will entertain the idea of re-opening the record to receive additional evidence about [Esther's] susceptibility to undue influence. However, if there is no genuine dispute of material fact on any one of the other three elements, and if the [Duerfeldts] are entitled to judgment as a matter of law as a result, [Esther's] medical records would be immaterial and would only cause unnecessary delay.

On February 10, 2023, the district court entered its order on the Duerfeldts' amended motion for summary judgment. The court excluded Hamilton's September 2022 affidavit (exhibit 55) and the attorney's September 2022 affidavit (exhibit 56) from the factual record. The court found that the Duerfeldts made a prima facie case that they were entitled to a partition; they provided evidence of the land contract, the deeds, and that there was no undue influence. The court found that Ploeger and Hamilton did not provide evidence creating a genuine issue of material fact that the land contract and deeds were not valid; Ploeger and Hamilton did not provide evidence creating a genuine issue of material fact regarding undue influence (only their "speculative assertions"), fraud, or mistake that would prevent the Duerfeldts' partition action. Accordingly, the court granted the Duerfeldts' amended motion for summary judgment and denied Ploeger's and Hamilton's motion to continue to conduct more discovery.

Ploeger and Hamilton appeal.

## III. ASSIGNMENTS OF ERROR

Ploeger and Hamilton assign, consolidated and reordered, that the district court erred when it (1) refused to consider exhibits 55 and 67, the affidavits of Hamilton and Ploeger, and erroneously found them inconsistent with deposition testimony, (2) refused to allow discovery of decedent Esther's medical records before considering summary judgment, and (3) granted partial summary judgment for the Duerfeldts.

## IV. STANDARD OF REVIEW

A jurisdictional issue that does not involve a factual dispute presents a question of law. *Humphrey v. Smith*, 311 Neb. 632, 974 N.W.2d 293 (2022).

In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment was granted, and gives that party the benefit of all reasonable inferences deducible from the evidence. *Id.* An appellate court affirms a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts and that the moving party is entitled to judgment as a matter of law. *Id.*

## V. ANALYSIS

### 1. Jurisdiction

Before reaching the legal issues presented for review, it is the duty of an appellate court to determine whether it has jurisdiction over the matter before it. *Humphrey v. Smith, supra*. For an appellate court to acquire jurisdiction of an appeal, there must be a final order entered by the court from which the appeal is taken. *Id.* Although partial summary judgments are usually considered interlocutory and must ordinarily dispose of the whole merits of the case to be considered final, partition actions are unique in that the action has two distinct stages: first, the title determination and, second, the division of the real estate, i.e., the "partition." *Id.*

The appealability of orders in partition actions depends on the nature of the controversy resolved and such orders can be arranged into three classes:

> (1) Where there is no controversy as to the ownership of the property in common and the right of partition, but the controversy is as to something relating to the partition, as whether the property can be equitably divided or must be sold, one party contending that it can be equitably divided and asking for a distinct portion of the property, and the other party contending that it cannot be equitably divided and asking that the whole property be sold, or some similar controversy in regard to the partition itself. When that is the case, the partition alone is the subject of litigation, and of course is not final until the partition is made.

> (2) The second class is where there is the same issue as above indicated as to the method of partition, and at the same time a distinct issue as to the title and ownership of the property. In such cases the parties would have a right to have their title first tried and determined, and, if that was done, the order thereon would be a final order, . . . but if the matter is tried to the court, and the parties do not ask that their title be first determined, and

- 6 -

there is no indication that the court proceeded first to determine the title, the parties should be held to have waived their right to appeal before the partition is completed.

(3) The third class is where everything depends upon the title and the nature of the title, and where, when that question is determined, the whole thing is determined. In such case there can be no doubt . . . that, when that question is determined, such determination is a final order, within the meaning of the statute, and is appealable.

*Humphrey v. Smith*, 311 Neb. at 639-40, 974 N.W.2d at 301 (ellipses in original).

Put differently, when the dispute in a partition action is over the partition itself rather than ownership or title, there is no final, appealable order until the partition is made. *Id.* When a partition action involves a dispute over ownership or title as well as a dispute over the method of partition, the parties have a right to have title determined first, and, if they elect to do so, an order resolving only the title dispute is a final, appealable order. *Id.* When the only issue in a partition action depends on ownership and the nature of the title, an order determining that issue is a final, appealable order. *Id.*

The parties agree that because the partial summary judgment related only to the title dispute involving the nine parcels of real property conveyed by Esther to the Duerfeldts in 2018, this court has jurisdiction over the appeal. We agree. Ploeger and Hamilton contested the transfer of Esther's ½ interest in said property, claiming that the sale was the result of undue influence, fraud, or mistake; they claimed this resulted in an invalid conveyance. However, the district court determined there was no evidence creating a genuine issue of material fact concerning the validity of the land contract and deeds from the May 2018 sale of Esther's ½ interest. The partial summary judgment order resolved only the dispute over the validity of the deed (which goes to ownership and title) but was not a judgment of partition itself because the statutory processes found in Neb. Rev. Stat. § 25-2170 et seq. (Reissue 2016) for such partition have not yet been satisfied. However, as set forth in *Humphrey v. Smith, supra*, partition actions are unique in that the action has two distinct stages: first, the title determination and, second, the partition. With title now determined, the parties can move forward with dividing the real estate, either equitably or by sale.

We are mindful that the Duerfeldts also asserted in their complaint that the State is the owner of an undivided ½ mineral interest in parcel 2, and that the Lewises (or other persons names unknown) have an undivided ½ mineral reservation in parcel 9. These interests were not raised or otherwise addressed in the partial summary judgment order. We conclude that the existence of these interests does not affect the finality and appealability of the partial summary judgment order before us. Now that title to the nine parcels has been determined, the siblings (and spouses) can proceed to the partition portion of the proceeding, at which time the mineral interests will have to be considered regardless of whether partition is accomplished by equitable division or by sale. As pointed out in the State's brief, it owns an undisputed, undivided ½ mineral interest in parcel 2. The State's "sole interest is to ensure that once the partition is settled, that ownership of its mineral interests remain." Brief for appellee State at 6. The Lewises' mineral reservation in parcel 9 can likewise be addressed once the parties and the court determine how partition will be accomplished.

Having concluded that we have jurisdiction over this appeal, we now address the errors assigned by Ploeger and Hamilton.

Ploeger and Hamilton claim that the district court erred when it refused to consider Ploeger's affidavit (exhibit 67) and Hamilton's affidavit (exhibit 55) after erroneously finding that the affidavits were inconsistent with their respective deposition testimonies.

### (a) Ploeger's Affidavit

Exhibit 67 is Ploeger's affidavit from December 2021. That affidavit explained why Ploeger believed that two named lawyers and their law firm should be disqualified as counsel for any party in this case, particularly alleging a lengthy history of legal representation for numerous members of the family and their business interests. This affidavit was received by the district court at the summary judgment hearing and the court did not find that it was inconsistent with Ploeger's deposition testimony. We note that in their brief, Ploeger and Hamilton also refer to exhibit 62 as being Ploeger's affidavit but exhibit 62 was a "Schedule of Distribution" in the probate case for Elmer's estate. Other than exhibit 67, no other affidavit by Ploeger was marked, offered, or received into evidence.

### (b) Hamilton's Affidavit

#### (i) General Propositions of Law

Where a party, without reasonable explanation, changes his or her testimony concerning the material facts on a vital issue, such change clearly being made to meet the exigencies of pending litigation, the testimony is discredited as a matter of law and should be disregarded. See *Momsen v. Nebraska Methodist Hospital*, 210 Neb. 45, 313 N.W.2d 208 (1981). In the foregoing situation, it is immaterial whether the contradictory testimony is given in a retrial of the same proceeding, in a pretrial deposition in pending litigation, or in related litigation under the same set of facts. See *id.* The important considerations are that the testimony pertains to a vital point, that the party clearly made the change to meet the exigencies of the pending case, and that no rational or sufficient explanation for the change in testimony exists. See *id.* "The rule would not, for example, necessarily apply in an automobile case where a party in his deposition testifies to his estimate of certain distances and then before trial, after a visit to the scene and viewing landmarks, makes measurements and changes his estimates." *Id.* at 55, 313 N.W.2d at 213.

*Momsen v. Nebraska Methodist Hospital, supra*, was a medical malpractice action. One of the defendants, a doctor, testified at his deposition that he had not been given the vital signs of the patient and that if he had, he would have gone to the hospital immediately because the vital signs indicated a serious condition. At trial, the doctor testified that he did not go to the hospital because the patient's vital signs had not changed, and it was his professional medical judgment that it was not necessary to go to the hospital. When asked how he could reconcile his trial testimony with that given in his deposition, the doctor responded, "'I can't.'" *Id.* at 52, 313 N.W.2d at 212. The Nebraska Supreme Court held that the doctor's trial testimony should be disregarded as a matter of law. It explained that the "important considerations" in whether inconsistent prior testimony is to be disregarded as a matter of law are whether the testimony "pertains to a vital point, that it is clearly apparent the party has made the change to meet the exigencies of the pending case, and that

there is no rational or sufficient explanation for the change in testimony." *Id.* at 55, 313 N.W.2d at 213.

The rule has been applied to affidavit evidence when offered in opposition to a motion for summary judgment, and the affidavit contradicts prior deposition testimony. See *Kaiser v. Union Pacific RR. Co.*, 303 Neb. 193, 927 N.W.2d 808 (2019). In *Kaiser*, the plaintiff sued his former employer under the Federal Employers' Liability Act for intentional infliction of emotional distress, alleging that while providing aid to an injured fellow employee, he was exposed to the risk of being run over by a railcar. To prevail on his claim, the plaintiff had to show that he was placed in the zone of danger. In his deposition, the plaintiff said he had no reason to believe that another employee did not tie down the railcars as the plaintiff had instructed. The plaintiff's affidavit in opposition to summary judgment, however, "consists almost entirely of reasons why [the plaintiff] was purportedly 'fully aware' that [the other employee] did *not* follow his instructions while at the scene of the accident." *Id.* at 202, 927 N.W.2d at 814-15. The Nebraska Supreme Court found that the "plaintiff failed to offer a reason why he was not able to recall being 'fully aware' that [the other employee] had not secured the railcars at his deposition but was able to do so in an affidavit submitted in opposition to a summary judgment motion signed nearly 6 years after the incident." *Id.* at 202, 927 N.W.2d at 815. The court also found that the plaintiff "obviously hoped" statements in his affidavit "could help him withstand summary judgment." *Id.* Additionally, the court said that the affidavit itself "tends to confirm that the change in testimony was brought about by the exigencies of litigation" because the plaintiff acknowledged in his affidavit "that its genesis was his review of legal documents regarding the zone of danger test." *Id.* The Supreme Court stated that under the circumstances, it could not say that the trial court erred by finding that the change in testimony was brought about by the exigencies of litigation and disregarding the affidavit under *Momsen v. Nebraska Methodist Hospital, supra*.

*(ii) Hamilton's Deposition Testimony*

In her October 2020 deposition, Hamilton testified about why she believed the May 2018 deed of Esther's ½ interest in the nine parcels of land to the Duerfeldts was invalid. We include some of the relevant deposition testimony below.

Q [(by counsel)]. So tell me why you claim the deed . . . is invalid?

A. I just -- just gut feeling, I guess. I really think it's not right. I mean, I think there's something wrong but I don't know what.

Hamilton was also asked if she had any personal knowledge regarding undue influence by Dale on Esther, and she replied, "Just things she told me." Hamilton confirmed that she did not personally hear conversations between Dale and Esther. Hamilton continued to be questioned regarding her claim of undue influence:

Q. Can you state a single fact that supports the allegation of undue influence?

A. There were many things. Trying to think just pertaining to this case. There's tons, tons of things, but I don't know on this case for sure.

Q. Well, I'm just asking, can you state a single fact that supports the allegation of undue influence within paragraph three of your answer . . .?

A. Um, just from what my mom has told me.

Hamilton was also questioned about what Esther told her:

Q. And what did she tell you?

A. Um, just things that went on during the week or things she had been told that --

Q. Things that she had been told by whom?

A. By Dale or his family.

. . . .

Q. What did they tell her?

A. I don't know how to describe it, but just influence, I guess.

Q. Well, what I'm trying to find out is what was said that you're claiming was undue influence on behalf of Dale Duerfeldt or Carol Duerfeldt?

A. Like my sister says about saying that the land was worthless, was no good.

Q. Who said that?

. . . .

A. My mother.

. . . .

Q. And did you ever hear Dale Duerfeldt tell her that?

A. No, she just said he did.

. . . .

A. The land she was talking about as worthless was the bottom land. She gave it away.

Q. So the land referenced within [the deed] that your mother sold to Dale and Caroline Duerfeldt for $1,127,500, you are not saying that she said that was worthless?

A. No.

Q. You're talking about some other land?

A. Yeah[.]

. . . .

Q. Okay. Referring to the land [that she sold], can you give me any specific communication that your mother related to you of undue influence by either Dale or Caroline Duerfeldt?

A. Not that I can remember at this time.

. . . .

Q. And what you're telling us in your testimony, that you don't have any information to support anything that was said or done by either Dale or Carol Duerfeldt that would have unduly influenced your mother in selling the land to them . . .?

. . . .

A. Not that I can remember right now.

When asked if she had any indication that this transaction was not Esther's own free will, Hamilton responded, "Just a gut feeling from what she told me" "through the years." Hamilton said that she spoke with Esther "every couple weeks." Hamilton had no direct knowledge of fraud in this case and was not aware of any mistake.

*(iii) Hamilton's Affidavit*

In her September 2022 affidavit (exhibit 55), Hamilton stated that she was a registered nurse with a master's degree in nursing, had been involved in health care and home health services for many years, and her nursing work included "geriatric care including widows." Hamilton then testified that after Elmer died, Dale used isolation and personal interaction with Esther, causing observed changes in her behavior toward her daughters, and that Esther exhibited "what we referred to in medicine as "Widow's Brain" which has "worsened and became a significant and long-term cognitive impairment." Hamilton gave specific examples of "actions which were highly irregular for [Esther] following her cognitive decline." She also gave examples of Esther's increased reliance on Dale, as well as Esther's statements about not wanting to "upset" or "anger" Dale by having others help her or spend time with her. Additionally, Hamilton stated that her parents had "shared a lifelong estate plan to . . . give their assets to their children in equal shares," but that changed after Elmer's death. According to Hamilton, "After [Elmer's] death for the remainder of [Esther's] life, [Esther] followed Dale's directions regardless of what he wanted," "[s]he was subject to Dale's influence." "Based on [her] extensive education and training as a registered nurse, and a person with long term interest in and work with geriatric patients," Hamilton opined that Esther was "not competent to make testamentary instruments or a deed after [Elmer's] death" and "was vulnerable and subject to Dale's undue influence throughout this time."

*(iv) District Court's Ruling*

In its order, the district court stated it agreed with the Duerfeldts that the *Momsen* rule applied to exhibit 55 (Hamilton's September 2022 affidavit), and the court therefore sustained their objection to exhibit 55 and disregarded it as a matter of law. Specifically, the court found that Hamilton's affidavit was a "direct change from previous deposition testimony." The court noted that in her affidavit, Hamilton "testifies for the first time about specific facts that support her claim of undue influence" when she had "previously testified that she had no factual support for undue influence that she observed or remembered." The court also pointed out that Hamilton's affidavit contained statements that directly contradicted her deposition testimony in that "Hamilton states that Dale isolated Esther, but both [Ploeger] and Hamilton previously testified that they frequently saw, talked, and/or visited with Esther." The court found that the changes in Hamilton's affidavit "go directly to a vital point in the lawsuit – the factual support for Hamilton and [Ploeger's] claim of undue influence." The court stated that the affidavit "does not cover new subjects from the prior depositions" and "does not include newly remembered communications with Esther," rather, in her affidavit "Hamilton provides significant observations to support the claim of undue influence, which was the direct subject of her prior deposition." Additionally, the court found that Hamilton's "recently disclosed medical opinion about widow's brain, which if true, would have been formed long before Hamilton testified at the prior deposition."

In response to Ploeger's and Hamilton's claim that Hamilton's affidavit was not in stark contrast to or a material change from the previous deposition, the district court stated that the questions asked at the deposition "were broad" and Hamilton was asked multiple times to state any fact or one example to support the claim of undue influence, but she could not give one fact or one example. The court found that, "Similar to *Kaiser*, Defendants fail to offer a reason they could not remember one fact or one example of undue influence at the time of their depositions,"

but nearly 2 years later and "only . . . in response to Plaintiff's . . . motion for summary judgment, have Defendants offered an affidavit with specific facts to support their claims." The court disregarded Hamilton's affidavit as a matter of law.

Having reviewed both Hamilton's October 2020 deposition and her September 2022 affidavit, we agree with the district court that the affidavit should have been disregarded as a matter of law. Hamilton's affidavit testimony pertained to a vital point (undue influence), she made the changes to meet the exigencies of the pending litigation, and there was no rational or sufficient explanation for the change in her testimony. See, *Kaiser v. Union Pacific RR. Co.*, 303 Neb. 193, 927 N.W.2d 808 (2019); *Momsen v. Nebraska Methodist Hospital*, 210 Neb. 45, 313 N.W.2d 208 (1981).

### 3. SUMMARY JUDGMENT

Ploeger and Hamilton argue that the district court erred by granting partial summary judgment determining Dale's ownership, and that it was inappropriate to do so without permitting further discovery.

A party moving for summary judgment makes a prima facie case for summary judgment by producing enough evidence to demonstrate that the movant is entitled to judgment if the evidence were uncontroverted at trial. *Kaiser v. Union Pacific RR. Co., supra*. Once the moving party makes a prima facie case, the burden shifts to the opposing party to produce admissible contradictory evidence showing the existence of a material issue of fact that prevents judgment as a matter of law. *Id*. Conclusions based on guess, speculation, conjecture, or a choice of possibilities do not create material issues of fact for the purposes of summary judgment; the evidence must be sufficient to support an inference in the nonmovant's favor without the fact finder engaging in guesswork. *Id*.

#### (a) Evidence Presented by the Duerfeldts

##### (i) Documentary Evidence

Among the evidence presented by the Duerfeldts was Dale's affidavit in support of the motion for summary judgment with attached exhibits. The exhibits included Esther's disclaimer and deed of a ½ interest in the nine parcels to her four children following Elmer's death, and the May 2018 "Joint Tenancy Warranty Deed" conveying Esther's ½ interest in the nine parcels of real estate to the Duerfeldts in consideration of $1,127,500.

##### (ii) Esther's Deposition Testimony

In her November 2019 deposition, Esther, then 95½ years old, testified that she had been residing in a nursing home since May 2019, after she fell and broke her hip around Thanksgiving 2018; prior to breaking her hip, Esther lived at home by herself. Esther confirmed that she was married to Elmer who died in 2006. She testified that she had four children: Dale, Ploeger, Hamilton, and Burgett. Esther and Elmer acquired a significant amount of real estate. Esther confirmed that after Elmers's death she retained a ½ interest in the real estate they acquired during their marriage that was currently involved in this partition action, and she disclaimed a ½ interest in the real estate; the disclaimed ½ interest went to her four children. There was additional farmland that remained solely in Esther's name.

Esther confirmed that in May 2018 she decided to sell her ½ interest in the real estate that is currently involved in this partition action to the Duerfeldts for $1,127,500. The Duerfeldts made a $500 down payment and were then to make payments pursuant to a payment schedule; the note was secured by a deed of trust. (The contract shows a purchase price of $1,127,500 with interest at the rate of 2.94 percent per annum; annual payments of $130,000 due on each December 1 from 2018 to 2026, with a final payment due in 2027.) When asked if Dale provided any input as to what the terms of the contract should be, Esther replied, "No, Dale didn't." Esther received the first payment on December 1, 2018, and an upcoming payment was due on December 1, 2019. Esther confirmed that the sale to the Duerfeldts was something she wanted to do, she signed the deed voluntarily, and she believed the price was fair and reasonable. For the sale price, they "went by the . . . assessor's record -- assessor's price." She denied that anyone forced her to sign the deed, attempted to unduly influence her, or that the deed was a result of fraud or mistake. She also did not believe that Dale used her power of attorney to gain an unfair advantage of her (she named Dale in her power of attorney in 2013, and when asked if Dale had done anything on her behalf under that document or if she had always carried out her own business, Esther replied, "I carried out my own business"). A few days prior to deciding to sell her interest in the real estate to the Duerfeldts, Esther also decided to gift additional property to Dale.

When asked why she decided to make the sale to the Duerfeldts, Esther responded: "Because Dale got a notice that he could no longer farm his dad's ground. And I felt sorry for him. So I gave him what I had and give him -- I wanted to make the sale." She said that Dale "worked all his life on the farm"; "[e]verything that needed to be done on the farm, he done everything to help us[,] [a]ll them years." Esther testified that Dale told her he got notice from the sheriff that he could no longer farm the land that was part of the family's corporation (Ploeger had taken control of that corporation). Esther was "hurt" that Dale was told he could no longer farm the corporation's farmland so she "went to the lawyer's office" and told the lawyer that she wanted to give Dale "everything" that she had personally (after Elmer died, Esther had some farmland that remained solely in her name, which she had rented to Dale on a 50/50 basis); "nobody told me," "[n]obody give me any ideas." Once the papers were ready, Esther called Dale and told him to come with Carol to the attorney's office because she (Esther) had papers for him to sign; "[a]nd he didn't know what I wanted." She gifted him her farmland, and then a few days later she decided to sell him other property because she wanted him to have more land to farm. She said that Dale did not ask to buy the land, but rather she told him that she wanted to sell him the land for "whatever the assessor price is," and then he agreed to buy it from her. When Esther signed the documents on May 24, 2018, only the attorney was present; Dale was not present. At the time of her deposition, it had been 1½ years since Esther sold her interest in the land at issue to the Duerfeldts, and Esther was still satisfied with the sale and did not want it undone in any way.

After Elmer died in 2006 and prior to May 24, 2018, Esther "made a lot of gifts." She said, "All my kids got farms and all of my grandchildren got money or farms"; "I give all the grandchildren 50,000 or a farm." Dale got more acres than the others because "[h]e farmed it all the time and the girls was nowhere around," "they were not farmers."

When asked if any doctor or healthcare provider ever indicated to her that she had any type of memory impairment, Esther responded, "No." And when asked if she had ever been evaluated for any type of an impairment of her memory, she responded, "No."

Regarding the farmland, Dale's daughter, Stacy Bailey, was Esther's bookkeeper after Elmer died; Stacy "keeps books of my expense and the income," but "I get the bills and I pay the bills."

### (iii) Dale's Deposition Testimony

In his October 9, 2020, deposition, Dale testified that he rented farmland from his parents prior to Elmer's death, and that the rental terms were "50/50" for expenses and income. After Elmer's death, Dale talked to his mother every morning.

Dale stated that he did not ask Esther to gift him property. Nor did he ask to buy Esther's ½ interest in the property. He said she called him and "had this all fixed out" and wanted to sell him her ½ interest; she already had the price figured out and the documents prepared. Dale recalled that Esther thought the sale would give her money if she had to go to the nursing home. Dale did not think that the sale price was out of line. The Duerfeldts later went to the attorney's office to sign the papers, and they have since made payments as provided by the contract.

Dale testified that both he and Esther used the Halbert Dunn law office ever since Elmer died. However, whenever there were personal transactions between him and Esther, Dale believed the law office represented both of them.

Dale did not know that Esther had given him her power of attorney since 2013, and he had never used it for transactions.

### (iv) Carol's Deposition Testimony

In her October 2020 deposition, Carol testified that she did not ask Esther to gift or sell them any land or interest in the land. And Carol denied that she unduly influenced Esther to make those transactions.

### (v) Richard Halbert's Deposition Testimony

In his July 2021 deposition, attorney Halbert testified that he represented Elmer prior to his death, was involved in the administration of his estate representing administrator Esther, and that the firm currently represented Esther. Halbert said he did not represent Dale in this sale. When asked if he had any recollection of the circumstances surrounding the execution of the documents, Halbert responded, "It was something Esther wanted to do." Halbert did not have any conversations with Dale regarding the deeds. Dale was not present when Esther executed her documents.

### (b) Evidence Presented by Ploeger and Hamilton

### (i) Ploeger's Deposition Testimony

In her October 2020 deposition, Ploeger agreed that the real issue in the lawsuit was the validity of the deed conveying Esther's ½ interest in the nine parcels of property to the Duerfeldts. When was asked if she was making a claim that Esther was not competent to sign the deed, Ploeger responded, "No." She was then asked questions regarding her claim that the deed issued to the Duerfeldts was not valid. We include relevant excerpts from her deposition.

Q [(by counsel)]. Why do you claim the deed is invalid?

A. I just don't think it's quite right, because I think he was -- my mom was influenced.

Q. In what way?

A. In one way is because my mom and dad was always fair to everything. And then after my dad died, everything had changed from that point, where, uh, it was, uh, totally different in lot of ways. Um --

Q. Okay. With regard to the validity of the deed, though, what is it that you -- why do you believe it's invalid?

A. Because I believe Dale influenced her for this. He always -- we had a conversation, Dale and I, out in front of our office and he says, "I deserve everything, you don't. And I'll make sure you won't."

. . . .

Q. When was that?

A. It was August 26, [2018].

Ploeger confirmed that she did not personally observe Dale unduly influence Esther. However, she claimed he tried to "belittle us girls" to their mother; but this was based on what Ploeger claimed her mother said and not anything Ploeger heard herself.

Ploeger was also asked about her claim of fraud:

Q. . . . Can you be more specific as to what fraud was involved in that particular sale and purchase?

A. I think it was just purely influenced. He always tried to convince her that he never has anything to farm, so he would have to have this farm to make a living.

. . . .

Q. . . . What I'm asking you is what that fraud consisted of? What was it?

A. Undue influence on it, but, fraud, can't recall.

Additionally, Ploeger was asked about her claim of mistake:

Q. You also indicated that this was a result of mistake. Who made the mistake?

. . . .

A. I think it was a mistake that he felt this way. It was a mistake doing this.

. . . .

A. I think the mistake is probably him having the influence because he had the power of attorney to influence -- he had the power of attorney over her to influence her a lot of things, plus he didn't have the -- and he also tried to influence her by calling her every day, which he never did that before 2006. He had no conversations with my mom before that.

Ploeger and her children visited Esther every Sunday from 11 a.m. to 5 or 6 p.m.

When asked if she could point to any "specific factual basis of conversation" Dale had with Esther concerning the purchase, Ploeger replied, "No."

*(ii) Hamilton's Deposition Testimony*

Hamilton's October 2020 deposition testimony was set forth previously in this opinion.

## (c) District Court's Ruling

The district court found that the Duerfeldts made a prima facie case that they were entitled to partition because they provided evidence of the land contract, the deeds, and that there was no undue influence, fraud, or mistake. The court further found that Ploeger and Hamilton did not provide evidence creating a genuine issue of material fact regarding undue influence, fraud, or mistake that would prevent the Duerfeldts' partition action.

We agree with the district court that Ploeger and Hamilton provided no evidence creating a genuine issue of material fact regarding fraud or mistake, as their testimony regarding such was essentially that Dale "unduly influenced" Esther. Thus, we need only address the claim of undue influence.

The elements necessary to warrant the rejection of a written instrument on the ground of undue influence are (1) that the person who executed the instrument was subject to undue influence, (2) that there was opportunity to exercise undue influence, (3) that there was a disposition to exercise undue influence for an improper purpose, and (4) that the result was clearly the effect of such undue influence. *Malousek v. Meyer*, 309 Neb. 803, 962 N.W.2d 676 (2021). Because undue influence is often difficult to prove with direct evidence, it may be reasonably inferred from the facts and circumstances surrounding the actor: his or her life, character, and mental condition. *Id*. Mere suspicion, surmise, or conjecture does not warrant a finding of undue influence; instead, there must be a solid foundation of established facts on which to rest the inference of its existence. *Id.*

The district court found that Ploeger and Hamilton failed to present evidence demonstrating that a materially disputed fact existed to support the elements of undue influence. First, they "neither provided nor pointed to competent evidence that Esther is a person who would be subject to Dale's influence," nor did they testify in their depositions about "Esther's cognitive decline or any other infirmity suggesting that her free agency was at risk." Second, there was no competent evidence of opportunity for undue influence; "[w]hile there was evidence that Dale called Esther regularly and worked on Esther's farm, Hamilton and [Ploeger] also testified they saw Esther weekly and communicated with her regularly." Third, there was no competent evidence that Dale was disposed to exercising undue influence on Esther; Ploeger and Hamilton "only testified that they felt something was not right or that they had a gut feeling." Fourth, Ploeger and Hamilton "have neither provided nor pointed to evidence and have not alleged any fact that would support that the consideration for the land contract, $1,127,500.00, is the effect of undue influence"; "[m]oreover, [they] have not provided evidence this amount was not fair consideration for the sale of the land."

We agree with the district court that Ploeger and Hamilton failed to satisfy the elements of undue influence, particularly with regard to the third and fourth elements: the disposition to exercise undue influence for an improper purpose and that the written instrument was clearly the effect of such undue influence. Ploeger and Hamilton provided nothing more than vague assertions and "gut" feelings that Dale influenced Esther. But mere suspicion, surmise, or conjecture does not warrant a finding of undue influence. *Malousek v. Meyer, supra*. Additionally, there was

evidence that the sale price was based on the "assessor's record," and Ploeger and Hamilton provided no evidence that the sale price was not fair or reasonable.

Although Ploeger and Hamilton assign error to the district court's refusal to allow discovery of Esther's medical records before considering summary judgment, we agree with the district court's finding in its earlier October, 28, 2022, order that Esther's medical records were not relevant for any other purpose except for the first element of the undue influence claim, and that "[i]f Plaintiffs can show no genuine issue of material fact on just one of the other three elements of undue influence such that they are entitled to judgment as a matter of law, then the medical records, which relate only to the first element, become immaterial." Because we have already found that Ploeger and Hamilton did not show genuine issues of material fact on the other elements of undue influence, the medical records are immaterial.

Viewing the evidence in the light most favorable to Ploeger and Hamilton, we find that there was no genuine issue of material fact regarding their claim of undue influence. Accordingly, we affirm the district court's order granting summary judgment to the Duerfeldts.

## VI. CONCLUSION

For the reasons stated above, we affirm the district court's February 10, 2023, partial summary judgment order resolving the challenge to ownership of the nine parcels of land that Esther conveyed to the Duerfeldts in May 2018.

AFFIRMED.

MOORE, Judge, participating on briefs.